**TIGG CORPORATION, Appellant in 91–3345,**

v.

**DOW CORNING CORPORATION, Appellant in 91–3232 and 91–3344.**

**Nos. 91–3232, 91–3344 and 91–3345.**

United States Court of Appeals, Third Circuit.

Argued Dec. 12, 1991.

Decided April 29, 1992.

---

1120

R. Dell Ziegler (argued), Anthony J. Guida, Jr., Buchanan Ingersoll P.C., Pittsburgh, Pa., for appellee and cross-appellant, TIGG Corp.

William T. Coleman, Jr. (argued), Debra A. Valentine, Nancy E. McFadden, John A. Rogovin, O'Melveny & Myers, Washington, D.C., James R. Jenkins, Gregory G. Thiess,

James J. Hayes, IV, Office of General Counsel, Dow Corning Corp., Auburn, Mich., for appellant and cross-appellee, Dow Corning Corp.

Before: BECKER, GREENBERG and ALITO, Circuit Judges.

## OPINION OF THE COURT

ALITO, Circuit Judge:

This is a breach of contract case. Following a jury verdict, the district court entered judgment for the plaintiff, Tigg Corporation, and against the defendant, Dow Corning Corporation, for more than $17.5 million, plus interest. Dow Corning appealed, and Tigg cross-appealed, alleging error in the determination of interest. We will affirm on all issues related to liability, but we will reverse and remand for a new trial on the question of damages.

### I.

The contracts in question concerned a new product developed to remove polychlorinated biphenyls ("PCBs") from electrical transformers. PCBs are toxic, and in 1982 the Environmental Protection Agency issued final regulations restricting the use, servicing, and disposal of transformers containing PCBs. At that time, thousands of existing transformers contained askarel fluid, a coolant rich in PCBs. The EPA regulations created an incentive for owners to remove the PCBs from existing transformers rather than replacing them. In order to accomplish this task, it was necessary, not only to replace the fluid with a substitute, but to remove the PCBs that had been absorbed over the years by the wood and paper products in a transformer's core.

To satisfy the anticipated demand for a product capable of removing these PCBs, Tigg and Dow Corning entered into a joint development agreement for a new product known as "RetroSil." This product, which consisted of a pumping unit (called a control station) and a filter component (called

the adsorber unit), was intended to work as follows. After the askarel fluid was drained from a transformer and replaced with a different coolant, Dow Corning 561 Silicone Transformer Fluid, the PCBs in the core would leach into the new fluid. The new fluid would be pumped through the adsorber unit, and the PCBs would be removed.

In June 1982, Tigg and Dow Corning entered into two agreements under which Tigg was to supply Dow Corning with its requirements of control stations and adsorbers. For the years 1982, 1983, and 1984, the agreements specified Dow Corning's "minimum" and "expected" purchases of control stations and adsorbers. The agreements did not specify figures for 1985 and 1986, but stated that these were to be provided by July 1, 1984. Under the agreements, if Dow Corning did not purchase the minimum adsorber units during a particular year, Tigg could sell these units to other customers.

Dow Corning bought the stated minimum for 1982. The minimums for 1983 were reduced by agreement of the parties,[1] but Dow Corning's purchases still fell short. Dow Corning purchased 102 control stations (instead of the reduced minimum of 480) and 500 adsorbers (instead of the reduced minimum of 1750).

In April 1984, Dow Corning claimed a "technical failure" in the product pursuant to a provision of the agreements and notified Tigg that it was suspending purchases. Dow Corning eventually terminated the agreements. For the entire year of 1984, Dow Corning bought no control stations and only 105 adsorbers; the minimums in the contract were 825 control stations and 2500 adsorbers. Dow Corning made no purchases for 1985 and 1986.

Tigg sued Dow Corning for breach of contract in the United States District Court for the Western District of Pennsylvania based on diversity of citizenship. Count One of the amended complaint alleged that

---

1. Tigg claimed that this agreement was unenforceable for a variety of reasons. App. at 38

(Amended Complaint, Count Two).

the contracts required Dow Corning to purchase the stated minimums in 1983 and 1984 but that Dow Corning had failed to do so. Count Two alleged that Dow Corning had wrongfully reduced the stated minimums for 1983. Count Three alleged that Dow Corning had acted in bad faith in setting its requirements (at nothing) for the years 1985 and 1986. Dow Corning contended that the minimums were not binding and that it had acted in good faith in setting its requirements.

The district court originally granted partial summary judgment for Tigg, holding that the contracts unambiguously required Dow Corning to purchase the minimums set out in their provisions. The district court certified this question for interlocutory review, and we reversed, holding that there was a genuine issue of material fact concerning the intended meaning of the term "minimum." *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358 (3d Cir.1987).

The case was then tried before a jury. Dow Corning contended that the minimums were not binding and that RetroSil was a flawed product that was rejected by the market. Dow Corning's position was that RetroSil could not reduce PCBs to acceptable levels any sooner than the leaching process itself allowed—about three to five years after the initial draining and flushing of a transformer. Since competing products cleansed transformers more efficiently and quickly, Dow Corning argued, RetroSil was a failure.

Tigg, on the other hand, argued that RetroSil was technologically sound. Tigg blamed any problems on other causes, such as the failure to change filters frequently enough and the use of Fluid 561 rather than allegedly better fluids. Tigg claimed that Dow Corning decided to abandon RetroSil, not because of defects in the product, but for other reasons, such as Dow's inability to produce enough Fluid 561 to meet the demand that existed even without RetroSil sales.

The jury returned verdicts for Tigg. The court then entered a judgment for Tigg in the amount of approximately $10 million, plus interest. In response to a motion by Tigg, the court later amended the judgment to add post-complaint interest so that the judgment exclusive of post-judgment interest was approximately $17.5 million.

## II.

 Dow Corning argues that the judgment should be reversed based on several alleged errors in the jury instructions. We review jury instructions to determine whether, if taken as a whole, they properly apprised the jury of the issues and the applicable law. *Gutzan v. Altair Airlines, Inc.*, 766 F.2d 135, 138 (3d Cir.1985). "[T]he charge, taken as a whole and viewed in light of the evidence, [must] fairly and adequately submit[ ] the issues in the case to the jury." *Link v. Mercedes–Benz of N. Am.*, 788 F.2d 918, 920 (3d Cir.1986). Several of Dow Corning's arguments involve questions of Michigan contract law. These questions are subject to plenary review. *Compagnie des Bauxites v. Insurance Co. of N. Am.*, 724 F.2d 369, 371 (3d Cir.1983).

A. *Instructions Concerning the Burden of Persuasion With Respect to Dow Corning's Alleged Bad Faith in Count Three.*

 Dow Corning's first set of arguments concerns the burden of persuasion on an element of Tigg's Count Three claims. As previously noted, Count Three claimed that Dow Corning acted in bad faith by not purchasing any control stations and adsorbers during 1985 and 1986, years for which no numerical minimums were specified in the contracts. In a requirements contract for the sale of goods, the Michigan Commercial Code imposes an obligation on the buyer to exercise good faith in setting its requirements. Mich. Comp.Laws Ann. [hereinafter Mich.] § 440.2306(1) (corresponding to U.C.C. § 2–306(1)); *Lorenz Supply Co. v. American Standard, Inc.*, 419 Mich. 610, 358 N.W.2d 845, 855 (1984) (Brickley, J., concurring).

Dow Corning contends, and Tigg does not dispute, that the burden of proving Dow's bad faith should have been placed on Tigg. We agree. Case law implies, but seemingly only implies, that the seller in a

requirements agreement case should bear this burden. *See Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 680 (3d Cir.1991) (Pa.Com.Code); *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333 (7th Cir.1988) (Ill.Com.Code); *Angelica Uniform Group, Inc. v. Ponderosa Sys., Inc.*, 636 F.2d 232 (8th Cir.1980) (Mo.Com.Code) (motion for new trial on ground that the court erroneously placed the burden regarding bad faith on the requirements seller was denied). Some commentators, however, advance a different theory, *viz*, that whoever is to benefit from a showing of bad faith must prove that element. *See* 1 J. White & R. Summers, *Uniform Commercial Code* § 3–8 (3d ed. 1990). In this case, Tigg would benefit from a showing of bad faith. Thus, under either theory, the district court should have placed the burden on Tigg. We now consider whether the charge adequately instructed the jury regarding the placement of this burden.

■■■ 1. Dow Corning argues that the jury was misled because the district court refused to give an instruction explicitly stating that Tigg had the burden of proving bad faith. The court, however, did give a general instruction assigning to Tigg the burden of persuasion on all elements of its claims. The court stated:

> [T]he plaintiff has the burden of proving those contentions which entitle it to relief. When a party has the burden on a particular issue, its contention on that issue must be established by a fair preponderance of the evidence.[2]

App. at 2322. A short time later, the court referred to Tigg's bad faith claim. "In Count Three," the court stated, "plaintiff claims that defendant did not act in good faith when it failed to buy its requirements for the years 1985 and 1986." Taken to-

gether, these two portions of the instructions meant that Tigg had the burden of proving bad faith; thus these two portions of the instructions conveyed the same message as the specific instruction that Dow Corning sought. To be sure, the specific instruction that Dow Corning requested would have helped to ensure that the jury correctly understood the law, but we cannot say that the omission of such an instruction was error. While jury instructions must "fairly and adequately submit[ ] the issues in the case to the jury" (*Link*, 788 F.2d at 920), a trial judge has broad discretion concerning the particular language used in a jury instruction.

■■■ Dow Corning also maintains that the following instruction erroneously implied that Dow Corning bore the burden of persuasion on this point:

> In count three, Plaintiff claims that Defendant did not act in good faith when it failed to buy its requirements for the years 1985 and 1986. The defendant claims that it acted in good faith and had no requirements for the years 1985 and 1986.... In this case, the defendant is *required to conduct its business in good faith* and according to commercial standards of fair dealing in the trade....

App. at 642 (emphasis added).

We do not believe that this instruction improperly assigned the burden of persuasion. The critical statement—"In this case, the defendant is required to conduct its business in good faith and according to commercial standards of fair dealing in the trade"—referred to Dow Corning's obligation under the contracts, not its burden of persuasion in court. Accordingly, we see no error.[3]

---

2. Likewise, before opening arguments, the court told the jury that "[t]he plaintiff has the burden of establishing or proving the issues presented in its case by the fair weight or preponderance of evidence." App. at 881. The court explained that "fair weight and preponderance ... means evidence which, when weighed against that which is opposed to it, has more convincing force so that the greater probability of truth lies therein." App. at 881.

3. Dow Corning also contends that the district court misplaced the burden of persuasion in the special interrogatory submitted to the jury. This special interrogatory asked: "Do you find from a preponderance of the evidence that defendant acted in good faith in buying its requirements during the years 1985 and 1986?" App. at 650. We find no indication in the record that Dow Corning objected to this wording at trial. Therefore, we will not reverse on this ground.

■ 2. Dow Corning maintains that the district court erroneously recast the burden of proof when it instructed the jury as follows:

> [Good faith] imposes upon the defendant an obligation to use its *best efforts* to promote the sale of the equipment covered by the contracts.

Dow Corning contends that a buyer's duty of "good faith" under a requirements contract (*see* Mich. § 440.2306(1) (corresponding to U.C.C. § 2–306(1))) does not include a duty to use "best efforts" to market the product purchased. Accordingly, Dow Corning argues that the instruction was improper. We disagree that the instruction was improper.

First, we do not believe that this instruction placed the burden of proving bad faith (or lack of best efforts) on Dow Corning. The instruction merely said that Dow Corning was obligated under the contract to use its best efforts to promote the sale of RetroSil. The instruction did not say anything concerning which party had the burden of proving lack of best efforts. Indeed, the instruction said nothing at all about the burden of proof.

■ Second, we agree with the district court that Dow Corning had a duty under the agreements to use its best efforts to promote RetroSil. The obligation to use best efforts to resell a product is imposed upon those buyers engaged in "exclusive dealing in the kind of goods concerned...." Mich. § 440.2306(2) (corresponding to U.C.C. 2–306(2)). *See Lorenz,* 358 N.W.2d at 854 n. 4 (Brickley, J., concurring). This obligation is intended to protect the original seller, who in an exclusive arrangement depends solely upon the buyer to resell the goods.[4] *See Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917).

In a non-exclusive arrangement the buyer's efforts in reselling the product may have little effect on the original seller. If the buyer does not resell the product, the seller, without breaching the contract, may solicit orders from other potential buyers. By contrast, in an exclusive dealing arrangement the seller has only one outlet for its goods. It is obligated not to sell to anyone except the buyer. In such a situation, the seller's interests are inextricably bound up with the success of the buyer in reselling the product. The obligation placed on the buyer to use best efforts reflects its monopoly power; the exclusivity arrangement makes the seller as subject to the decisions of the buyer as a subsidiary within the buyer's firm. The obligation of best efforts forces the buyer/reseller to consider the best interests of the seller and itself as if they were one firm.

■ Dow Corning contends that the agreements in this case were requirements contracts, not exclusive dealing agreements. There is no reason, however, why a requirements contract may not also involve an exclusive dealing restriction. Such a contract would obligate the buyer to buy its requirements from the seller and obligate the seller to sell only to the buyer. That is precisely the nature of the agreements between Tigg and Dow Corning. Dow Corning was obligated to buy its requirements from Tigg; thus, Dow Corning owed a duty to set its requirements in good faith. Tigg was generally forbidden to sell to any other buyer; thus, Dow Corning owed a duty to use its best efforts to resell the product.

■ Dow Corning argues that the agreements did not create an exclusive dealing arrangement because Tigg could sell adsorbers to other buyers if Dow Corning did not buy the stated minimums. However, the jury found Dow Corning in breach for failing to order the stated minimums in 1983 and 1984 and found the minimums to be binding. This means that the provision allowing Tigg to sell to other buyers was operative only in the event of Dow Corning's breach. So long as Dow Corning did not breach, Tigg was obligated to sell to Dow Corning and only Dow Corn-

---

4. The seller in such an arrangement must "use best efforts to supply the goods...." Mich. § 440.2306(2) (corresponding to U.C.C. 2– 306(2)). Dow Corning has not alleged that Tigg failed in this duty.

ing. Accordingly, the provision on which Dow Corning relies is only, in effect, a remedies clause, and we do not believe that such a clause, by itself, destroys the exclusivity of the contract.[5]

 Dow Corning suggests that the agreements in this case were not exclusive dealing agreements because Tigg was an "equipment supplier," rather than a manufacturer, and Dow Corning was not a "distributor." These labels, however, are not dispositive. Nor is it dispositive, as Dow Corning suggests, that the agreements did not expressly require that Dow Corning use its best efforts. The obligation to use best efforts is implied under Mich. § 440.-2306(2) (corresponding to U.C.C. § 2–306(2)) "unless otherwise agreed" whenever the parties have made a "contract to refrain from supplying any other dealer or agent. . . ." Mich. § 440.2306 (corresponding to U.C.C. § 2–306) official comment 5. In order for an obligation to use best efforts to be implied, the contract need not involve special kinds of parties or goods; the contract need only preclude the seller from selling goods to any other buyer while the contract is in force.[6] The con-

tract between Tigg and Dow Corning imposed such an obligation, and therefore the district court was correct in charging on best efforts.[7]

 3. Dow Corning next contends that the jury instructions erroneously suggested that its good faith requirements could not have been zero. As Dow Corning correctly observes, under the U.C.C., a requirements buyer may have a good faith reason for demanding no goods from the seller. In such a case, the buyer does not breach by ordering no goods. *See Advent,* 925 F.2d at 680; *Empire Gas,* 840 F.2d at 1337–38; *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.,* 130 F.2d 471, 473 (3d Cir.1942).

Dow Corning requested a specific instruction on this point, but the district court refused. Moreover, the court instructed the jury that Dow had to act "according to commercial standards of fair dealing in the trade so that its requirements will approximate *a reasonably obtainable figure."* App. at 642 (emphasis added). Dow Corning maintains that this instruction "improperly suggest[ed] that Dow Corning's requirements could *not* be

---

**5.** The Michigan Commercial Code itself provides a similar remedy for the seller in an exclusive dealing agreement. When the buyer in such an agreement breaches, the seller may sell the goods to others. Mich. § 440.2706 (corresponding to U.C.C. § 2–706). Since this rule of law does not destroy the exclusivity of the contracts to which it applies, the same must be true of the contract provision here.

**6.** Dow also argues that because it insisted on the exclusivity arrangement in order to protect its interest in the technology it was to allow Tigg to use in the joint venture no best efforts obligation ought to be implied. We disagree. Mich. § 440.2306(2) (corresponding to U.C.C. § 2–306(2)) imposes this obligation when its terms are met regardless of the motivation for agreeing to those terms or the interest the parties seek to protect in agreeing to those terms. Dow has cited no authority that suggests that either the exclusive nature of the arrangement is destroyed or that the obligation to use best efforts should not be applied in this circumstance.

**7.** The district court erred in suggesting that a requirement buyer's obligation to take requirements in "good faith" under Mich. § 440.2306(1) (corresponding to U.C.C. § 2–306(1)) includes a

duty to exercise "best efforts" to promote the resale of the product. The obligation to use "best efforts" to resell the product exists under Mich. § 440.2306(2) (corresponding to U.C.C. § 2–306(2)) only in an exclusive dealing contract. Therefore, under a requirements contract lacking an exclusive dealing provision, no "best efforts" duty would exist. In the present case, however, the contracts in question contained both "requirements" and "exclusive dealing" provisions and therefore both obligations applied.

In describing the "best efforts" obligation of a buyer under an exclusive dealing contract, some courts have written that this obligation entails a duty to act in good faith. *See, e.g., Gestetner Corp. v. Case Equip. Co.,* 815 F.2d 806 (1st Cir. 1987) (Me.Com.Code); *Hoover's Hatchery, Inc. v. Utgaard,* 447 N.W.2d 684 (Ia.App.1989); *Kubik v. J & R Foods of Or., Inc.,* 282 Or. 179, 577 P.2d 518 (1978). While we agree that an exclusive dealing buyer's obligation to exercise "best efforts" probably subsumes an obligation to act in "good faith," it is important to distinguish this obligation, which is a feature of exclusive dealing contracts, from a requirements buyer's obligation to take requirements in "good faith" under Mich. § 440.2306(1) (corresponding to U.C.C. § 2–306(1)).

zero and must have some reasonable relationship to the 1982–84 minimum." Appellant's Brief at 28.

Once again, however, we cannot conclude that the district court erred. The reference to "a reasonably obtainable figure" did not suggest that Dow's requirements could not be zero. If Dow Corning reasonably concluded that RetroSil was a commercial failure, its "reasonably obtainable" requirements could be zero. Moreover, while the specific instruction Dow Corning requested might have been helpful, it was not obligatory. Dow argued to the jury that its requirements were zero, and the instructions did not foreclose or discourage the jury from choosing that number. Nor was the jury told that good faith required Dow to order goods even if it did not, in good faith, require the goods. Thus, we find no ground for reversal.

B. *Other Jury Instructions.*

■ 1. Dow Corning next argues that the district court erred in giving the jury, as part of the instructions on Count One, a charge on the rule of contract interpretation known as *contra proferentem.* The court charged as follows:

> If you, Members of the Jury, are unable to ascertain the intention of the parties from the evidence in the case, you may refer to a rule of interpretation of contracts; that a contract may be interpreted adversely to the party that drafted or wrote the contract.

App. at 2329.

■ Dow Corning contends that the instruction was erroneous for several reasons. Dow Corning maintains that this rule may be applied only by a court, not a jury. Dow Corning further argues that the rule was inapplicable in this case because Dow Corning and Tigg were roughly equal in bargaining power and because the agreements were drafted collaboratively rather than by Dow Corning alone. It is not apparent that Michigan law provides clear answers to any of these arguments. We do not believe it is necessary, however, to predict how the Michigan Supreme Court would decide these questions because we are convinced that the instruction, even if

erroneous, was harmless. In a civil case, an erroneous instruction provides a basis for reversal only if it was "inconsistent with substantial justice" (Fed.R.Civ.P. 61) or affects "a substantial right of [a] party" (Fed.R.Evid. 103(a)). *See McQueeny v. Wilmington Trust Co.,* 779 F.2d 916, 923–28 (3d Cir.1985). This standard is not met here.

In the first place, the instruction did not identify Dow Corning as the drafter of the agreements, and Dow Corning attempted to portray Tigg as co-drafter. *See, e.g.,* app. at 2275–76. Thus, even if the jury relied on the instruction, it is by no means clear that the instruction benefitted Tigg.

More important, the *contra proferentem* instruction by its terms applied only if the jury was "unable to ascertain the intention of the parties from the evidence in the case." Here, it seems most unlikely that the jury was unable to reach agreement concerning the meaning of the term "minimum[s]" based on the contract language and the other evidence. Although we previously held that the contract language alone was not sufficient to support partial summary judgment for Tigg, that language was indisputably powerful evidence in Tigg's favor. The relevant provision of the control stations agreement read as follows:

> 1.2 Agreement
>
> DOW CORNING shall purchase from TIGG, and TIGG shall sell to DOW CORNING, the Control Stations specified in Paragraph 1.3 in the quantities specified in Paragraph 1.4.
>
> 1.3 Product
>
> RetroSil™ Control produced exclusively for DOW CORNING in accordance with the DOW CORNING specifications attached as Exhibit 1.
>
> DOW CORNING may revise its specifications at any time.
>
> 1.4 Quantity
>
> DOW CORNING agrees to purchase annually the minimum quantity of RetroSil™ Control Stations to specifications set out in Exhibit 1, indicated in the table below.

RetroSil™ Control Stations

| Contract Year | Minimum | Expected |
|---|---|---|
| 1982 | | |
| 3rd Quarter | 66 | 165 |
| 4th Quarter | 66 | 248 |
| Total | 132 | 413 |
| 1983 | 578 | 1115 |
| 1984 | 825 | 2228 |
| 1985 and 1986 | To be provided by July 1, 1984. | |

1.10 Remedy for Failure to Supply

In the event that TIGG is unable to supply at least fifty percent of the current annual minimum quantity during any calendar quarter, DOW CORNING may make up the deficiency by purchasing from another source and the quantity so purchased will be deducted from DOW CORNING's annual minimum purchase requirement.

2.5 Entire Amount

The terms and conditions herein represent the entire Agreement between the Parties with respect to the sales of goods indicated above and may be modified only by a writing signed by both Parties.

Each Agreement provided that Dow Corning's "minimum purchase obligations" would be reduced for any period when TIGG's equipment failed to "perform properly for the removal of PCBs from transformer fluid" and the parties were attempting to rectify such a deficiency.

Each Agreement also provided that:

The parties shall meet annually in November to adjust quarterly forecasts for the next contract year and to adjust annual minimums, if necessary.

(The agreement on adsorbers contained a provision that was identical except for the numbers of units listed.)

Both the ordinary meaning of the term "minimum" and the contrast with "expected" purchases weighed heavily in favor of Tigg's interpretation. We have reviewed the other evidence on which Dow Corning

relied to show that the term "minimum" really meant a "forecast."[8] While this evidence was sufficient to create a jury question, the evidence in favor of Tigg's interpretation of the term "minimum" was overwhelming,[9] and thus the instruction in question, even if erroneous, was clearly harmless.

 2. Dow Corning contends that the trial court erred in giving the following instruction concerning the scales of justice:

You will recall the illustration of the scales of justice which I suggested to you at the beginning of the trial. Onto one side of the scale place all of the evidence favorable to the plaintiff. Onto the other, place all the evidence favorable to the defendant. If after considering the comparable weight of the evidence you feel that the scales tip to the slightest degree in favor of the plaintiff, your verdict must be for the plaintiff. If the scales tip in favor of the defendant or are equally balanced, your verdict must be for the defendant.

App. at 2322.

Dow Corning claims that this charge led the jury to disregard Tigg's burden of proving every element of its claims. Instead, Dow argues, this instruction told the jury to "lump *all* the evidence on *all* issues into just two piles—one favorable to the plaintiff, one favorable to the defendant, and compare the two piles." Brief for Appellant at 34. We reject this argument.

It is doubtful that this portion of the charge, even if viewed in isolation, would constitute reversible error, and when this portion is viewed in the context of the entire charge, we are convinced that no error occurred. The court carefully instructed the jury on the elements of each separate claim. In addition, just four sentences before the portion of the charge quoted above, the court told the jury that "the plaintiff has the burden of proving

---

8. *See, e.g.,* app. at 1096–1229 (cross-examination of Campbell by counsel for Dow), 3313–16 (documents used in that cross-examination). *See also* app. at 2274–76 (closing argument by counsel for Dow summarizing evidence). Dow

called no witness who represented Dow in the contract negotiation or drafting.

9. *See, e.g.,* app. at 2290–94 (closing argument by counsel for Tigg summarizing evidence).

those contentions which entitle it to relief. When a party has the burden on a particular issue, its contention *on that issue* must be established by a fair preponderance." App. at 2322 (emphasis added). In addition, the court required the jury to answer ten special interrogatories rather than merely rendering a general verdict. In order to answer these questions, the jury had to consider the evidence on each point separately. For these reasons, we conclude that the charge did not mislead the jury regarding Tigg's obligation to prove every separate element of its claims.

In sum, we have found no reversible error in any part of the jury instruction relating to liability, and we will accordingly affirm the judgment of the district court with respect to liability.

### III.

■ Dow Corning contends that the district court committed reversible error in a portion of the jury instructions relating to damages. Over objection, the district court instructed the jury that the proper measure of Tigg's damages was its "lost profit; that is the contract price of each piece of equipment less all expenses not incurred because production never took place." App. at 2332. Dow Corning claims that this charge was incorrect and that the proper measure of damages should have been based on the contract price minus the market price. We agree.

■ A seller's damages for non-acceptance or repudiation are generally measured by "the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in [U.C.C. Article 2], but less expenses saved in conse-

quence of the buyer's breach." Mich. § 440.2708(1) (corresponding to U.C.C. § 2–708(1)). In certain circumstances, however, the seller may recover damages in accord with different measures. If the seller has resold the goods, the seller may choose to seek damages based on the difference between the resale price and the contract price. Mich. § 440.2706 (corresponding to U.C.C. § 2–706). Under certain circumstances, the seller may recover the full price under Mich. § 440.2709 (corresponding to U.C.C. § 2–709). Tigg has never sought recovery under this theory.[10] Finally, Mich. § 440.2708(2) (corresponding to U.C.C. § 2–708(2)) provides for damages measured by "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in [U.C.C. Article 2], due allowance for costs reasonably incurred and due credit for payments or proceeds of resale." This is the remedy set out in the challenged instruction, but this remedy is available only "[i]f the measure of damages provided in subsection (1) [contract/market damages] is inadequate to put the seller in as good a position as performance would have done...." Mich. § 440.2708(2) (corresponding to U.C.C. § 2–708(2)). Thus, the district court's charge would be correct only if contract/market damages were first found to be inadequate.

The district court's charge, however, did not ask the jury to determine whether contract/market damages were "inadequate" as defined by Mich. § 440.2708(1) (corresponding to U.C.C. § 2–708(1)), and the district court provided no explanation for this omission. Tigg might have shown that this measure of damages was inadequate under two possible theories: (1) because it was a

---

**10.** Under this provision, the seller generally "must hold for the buyer any goods which have been identified in the contract and are still in his control." Here, however, Tigg never manufactured the goods for which it·recovered. While it is not perfectly clear whether goods not yet manufactured may be the basis for an action for the price, damages calculated under Mich. § 440.2708 (corresponding to U.C.C. § 2–708) are an appropriate remedy when the seller learns of the breach during or before the manu-

facture of the goods. *Detroit Power Screwdriver Co. v. Ladney,* 25 Mich.App. 478, 181 N.W.2d 828 (1970). *See also Cesco Mfg. Corp. v. Norcross, Inc.,* 7 Mass.App. 837, 391 N.E.2d 270 (1979). In any event, Tigg did not seek damages under Mich. § 440.2709 (corresponding to U.C.C. § 2–709); nor did Tigg attempt to establish compliance with the requirements of identifying and attempting to resell the goods necessary to maintain an action for the price.

lost-volume seller or (2) because it was a producer of specialty goods that could not be resold. Neither theory, however, justified the court's charge.

We have defined a lost-volume seller as follows:

> A lost volume seller is one who upon a buyers breach of contract, resells the article to a second purchaser at the price agreed to by the first purchaser. The second purchaser, however, would have purchased a similar article notwithstanding the first purchaser's breach. Under such circumstances, when the seller resells the article, he is still not made whole because "he will have lost one sale, one profit, over the course of the year." (citation omitted)

*Storage Technology Corp. v. The Trust Co. of N.J.*, 842 F.2d 54, 56 n. 2 (3d Cir. 1988) (N.J.Com.Code).

In *Ragen Corp. v. Kearney & Treaker Corp.*, 912 F.2d 619, 627 (3d Cir.1990), we elaborated:

> The key inquiry is the sellers' ability to provide the product to both the breaching buyer and the resale buyer. If a seller could have sold an item to both a subsequent buyer and a breaching buyer, then the seller has suffered damage which can only be remedied by an award of lost profits.

It seems most unlikely that Tigg fits within this definition. Tigg argues strenuously in its brief that there was no market for the adsorbers and control stations. Appellee's Brief at 28. Accordingly, Tigg cannot contend at the same time that it could have sold additional adsorbers and control stations to others even if Dow Corning had fulfilled its purchase obligations. It therefore appears to follow that Tigg was not a lost-volume seller. However, we will not (and do not) go so far as to hold that Tigg was not a lost-volume seller. We need only conclude that the district court could not find as a matter of law that Tigg *was* a lost-volume seller. At the very least, the court was obligated to submit this factual question to the jury. *See Ragen Corp.*, 912 F.2d at 626–628.[11] It failed, however, to do so.

We therefore turn to the question whether Tigg was a manufacturer of "specialty items." *See KLT Indus. v. Eaton Corp.*, 505 F.Supp. 1072 (E.D.Mich.1981); *Great No. Packaging, Inc. v. General Tire & Rubber Co.*, 154 Mich.App. 777, 399 N.W.2d 408, 413 (1986); *Detroit Power Screwdriver Co. v. Ladney*, 25 Mich.App. 478, 181 N.W.2d 828, 832–33 (1970). Contract market damages are inadequate in cases involving specialty items because of the difficulty in reselling unique products that have been manufactured for and have special value to certain buyers. *See In re Earle Indus.*, 88 B.R. 52, 56 (Bankr. E.D.Pa.1988); *Detroit Power*, 181 N.W.2d at 832. The determination whether the goods are specialty items, however, is properly for the finder of fact—in this case the jury. In *Detroit Power*, the trial court had awarded lost profit damages. The Michigan Court of Appeals remanded, stating:

> The ruling of the court below did not include a *factual determination of whether the [product] here involved is a specialty item without a reasonably accessible market. It is the function of the trial court[, when] sitting without a jury[,] to make findings of fact.* GRC 1963, 517.1. . . .
>
> We therefore remand the case for further findings. If the trial court finds that the [goods are] a specialty item without a reasonably accessible market, then it shall award [lost profit] damages pursuant to § 2–708(2).

181 N.W.2d at 834.

Under Michigan law, therefore, the question whether the goods that Tigg sold to Dow Corning were "specialty items" is one that the jury must determine, unless of course the evidence was so overwhelming that a reasonable jury would have been compelled to conclude that the goods were

---

**11.** Although this issue is governed by Michigan law, we have found no Michigan law or cases dealing with the issue of the lost-volume seller. However, courts of other states have been consistent in deciding this question under the U.C.C., and we predict that Michigan would not significantly differ from them.

unique and without a resale market. Based on the evidence marshaled by the parties,[12] however, we are unable to hold that a reasonable jury would have to reach that conclusion. While it may well turn out that Tigg did sell specialty items, we cannot reach that conclusion as a matter of law on the present record. Accordingly, we must hold that the district court's instruction on damages was erroneous and that a new trial on damages is required.

## IV.

In conclusion, we will affirm the judgment of the district court on liability but reverse and remand for a new trial on damages. Since we must vacate the damage award, we do not have to address the parties' arguments regarding interest.

---

**12.** *See, e.g.,* Brief for Appellee at 28–29; Reply Brief for Appellant at 7 n. 5, 16.