23 F.3d 407
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Glenn W. MULLETT, Plaintiff-Appellant,
Mary S. Mullett, Plaintiff,
v.
CONSOLIDATED ALUMINUM CORPORATION, Local 5760, United
Steelworkers of America, District 23, United
Steelworkers of America, Defendants-Appellees,
 No. 92-4231.
 United States Court of Appeals, Sixth Circuit.
 April 25, 1994.
 
 Before: MILBURN and GUY, Circuit Judges; and TIMBERS, Senior Circuit Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff Glenn W. Mullett appeals the jury verdict for defendants in this hybrid Sec. 301 action (No. 92-4231), brought pursuant to 28 U.S.C. Sec. 185, alleging breach of a collective bargaining agreement by his employer, Consolidated Aluminum Corporation ("Conalco"), and breach of the duty of fair representation by the Union, the United Steelworkers of America, Local 5760 and District 23. On appeal, the issues are (1) whether the district court erred in refusing to give certain jury instructions requested by plaintiff; (2) whether the district court erred in refusing to admit plaintiff's proffered exhibits 3, 6, 7, and 8 into evidence; and (3) whether the district court erred when it restricted the scope of plaintiff's cross-examination of adverse witnesses as well as plaintiff's direct examination of some of his witnesses. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 On June 26, 1986, plaintiff was suspended from his employment at Conalco for five days, subject to discharge, due to an altercation with a foreman in the plant. On June 30, 1986, plaintiff's suspension was converted into a discharge. Local 5760 timely filed a grievance challenging plaintiff's discharge; however, the issue was not resolved through the grievance procedure. Subsequently, as provided in the collective bargaining agreement between Conalco and the Union, the matter was submitted to binding arbitration. Plaintiff was represented at the arbitration hearing by representatives of the international union, District 23. On December 24, 1986, the arbitrator denied plaintiff's grievance and upheld his discharge.
 
 
 3
 Plaintiff filed his complaint in district court on June 22, 1987, alleging that Conalco breached the collective bargaining agreement between the parties by discharging him without just cause. The complaint also alleged that Local 5760 and District 23 of the United Steelworkers of America ("USWA") breached their duty of fair representation by improperly preparing and presenting his case at the arbitration hearing. The case was tried before a jury on October 6, 7, 8, 9, 13, and 14, 1992. At the close of trial, the jury was given both interrogatories and a general verdict form.
 
 
 4
 After their deliberations, the jury found that just cause existed for plaintiff's discharge by Conalco. In accordance with the instructions given by the district court, the jury answered no further interrogatories and returned a general verdict in favor of defendants. Thereafter, the district court entered a judgment in favor of defendants based on the jury's verdict. Plaintiff timely appealed.[1]
 
 B.
 
 5
 Plaintiff Glenn Mullett, after graduating from college in 1961, had extensive industrial experience prior to being hired by Conalco in September 1977. Conalco manufactures aluminum at its plant in Hannibal, Ohio.
 
 
 6
 In June 1986, plaintiff was working as an area millwright in the cast house at Conalco's plant. The cast house is a large area at one end of the plant where furnaces melt ore and molten aluminum is "cast" into ingots of varying sizes. The duties of the area millwright at the plant included maintenance of equipment as well as handling breakdowns and outages. A millwright at Conalco must be qualified as a welder, pipe fitter, and a mechanic.
 
 
 7
 All of Conalco's 750 production and maintenance employees are represented by unions, and approximately 250 of Conalco's employees are assigned to maintenance. Maintenance employees are supervised by maintenance supervisors or foremen, who are distinct from the hierarchy of production supervisors who oversee the daily operations of the production department. The plant maintenance employees are responsible for overhauls, which involve scheduled shutdowns of equipment for repairs, as well as repairs of the sporadic breakdowns which occur in any industrial operation. Generally speaking, the repair of a breakdown has a higher priority than an overhaul, since a sudden breakdown is more likely to result in a production delay. The changeover of a mold, as in this case, is not a breakdown; however, it tends to be a high priority item because it can delay the production of aluminum ingots. Area millwrights were also designated as the individuals who would respond quickly to production needs such as the repair of breakdowns.
 
 
 8
 Plaintiff was covered by the terms of a collective bargaining agreement between Conalco and USWA Local 5760, which was in effect from June 1, 1983 until May 31, 1986. In 1986, the contract was extended by agreement of the parties; it remained in force until January 1, 1987. Plaintiff's duties as an area millwright in the cast house included responding to requests for assistance from production foremen as well as regular maintenance tasks, which were assigned by maintenance foremen. Because the area millwright was subject to direction from both production foremen and maintenance foremen, which often led to requests for the area millwright to be at two different locations in the plant at the same time, this often led to problems within the plant. However, pursuant to language contained in Appendix 13 to the collective bargaining agreement, maintenance employees and area millwrights were directed to follow the last instruction they received, even if that instruction was from a production foremen and conflicted with a direct order they had been given by their direct supervisors, who were maintenance foremen.
 
 
 9
 On the morning of June 25, 1986, plaintiff and a co-worker, Roger Langsdorf, were given orders by their immediate supervisor, John Schmidt, to go to the number 7 melter (melting furnace) in the plant. That same morning, Jim Henthorn, a production foreman, needed assistance from a millwright for a mold changeover in the number 3 pit, which involved the millwright cutting the metal straps which held the mold in place with a welding torch so that a different sized mold could be used. Lowell Walls, another production foreman, paged plaintiff to come to the number 3 pit to do this work. The area millwright was required to answer whenever he was paged; however, plaintiff testified that due to the level of noise in the plant, he never heard the page from Walls.
 
 
 10
 Thereafter, plaintiff went to the tool crib area to pick up the tools necessary to complete the task at the number 7 melter which John Schmidt had assigned to him. After obtaining the tools, he commenced driving a flatbed truck, on which a welding machine had been affixed, through the plant toward the number 7 melter. As plaintiff was driving the flatbed truck, he drove past the number 3 pit. At that point, Henthorn, who knew that plaintiff was the area millwright on that shift, waved at plaintiff to stop, but plaintiff kept on driving. When plaintiff finally stopped, Henthorn approached him and asked that he go to the number 3 pit and burn off some straps. Henthorn's statement to plaintiff was couched in the form of a request rather than a direct order.
 
 
 11
 Plaintiff replied that Schmidt had already assigned him to another job, and he told Henthorn to go see Schmidt. Henthorn responded that the task would only take a few minutes. Plaintiff also testified that Henthorn stated that he had already talked to Schmidt; however, Henthorn denied making that statement. Because plaintiff had just met with Schmidt in an area of the plant without a telephone, plaintiff believed that Henthorn was lying to him. Plaintiff admits that he then told Henthorn to "go to hell," J.A. 381, got back on the flatbed truck, and started to drive away.
 
 
 12
 Plaintiff testified that as he was driving away, he turned around and saw Henthorn clenching his fist and grimacing. According to plaintiff, at that point in time he believed that Henthorn was "stalking" him, and he feared that Henthorn would throw something at him and injure him because he once saw Henthorn throw a water balloon at another employee during some horseplay in the employees' lunchroom. Plaintiff then stopped the truck and jumped off it, charged or bumped into Henthorn, and stated "F--- you, don't you ever tell me anything to do." J.A. 226. He also stated that Henthorn was not his supervisor and should not have given him an assignment. Various descriptions were given about the contact between Henthorn and plaintiff which were described as "just touching" and "belly-to-belly." At trial, plaintiff testified that after the incident with Henthorn he felt that the problem had been resolved and that the "pecking order" in the plant had been restored. J.A. 124.
 
 
 13
 After the incident, Henthorn reported the occurrence to his supervisor, Charlie Merritt, the cast house production superintendent, who asked Henthorn to write out a description of the incident. Subsequently, a series of meetings was held to investigate and discuss the incident. The day of the incident, Mel Douthit, the senior maintenance supervisor, called together the ranking union officials at the plant as well as plaintiff, Henthorn, and Walls. After hearing both plaintiff's and Henthorn's versions of the event, Douthit asked Walls to explain what he had witnessed. At the conclusion of the meeting, Douthit concluded that plaintiff had violated two plant rules: Rule 1, which prohibits insubordination and willful disobedience of orders including the use of profanity or threatening language towards a supervisor; and Rule 15, which prohibits the threatening, intimidation, or coercion of other employees. Douthit reported his conclusion to his supervisor, and plaintiff was ultimately suspended for five days subject to discharge.
 
 
 14
 Earl Petty, Conalco's Labor Relations Superintendent, was informed of the events involving Henthorn and plaintiff on June 25, 1986, while he was involved in contract negotiations with the union in Pittsburgh, Pennsylvania. Petty made the decision to issue the five-day suspension subject to discharge. On June 30, the suspension was converted to a discharge.
 
 
 15
 The union filed a grievance on plaintiff's behalf. The grievance was denied by Conalco at the second, third, and fourth steps of the grievance procedure. Gary Cochran, the president of Local 5760, approached Earl Petty between the third and fourth steps of the grievance procedure and asked Petty if Conalco would be willing to work out a "last chance agreement" with plaintiff. Petty responded that Conalco would have to receive strong assurances from plaintiff that the same type of incident would not occur in the future. Subsequently, after a discussion with plaintiff during which plaintiff told Cochran that he wanted full back pay, overtime, interest, and an apology from Conalco, Cochran approached Petty and informed him that plaintiff was not interested in a last chance agreement.
 
 
 16
 Throughout the grievance procedure, plaintiff refused to give Conalco any assurance that he would not behave in the same manner in the future. There was testimony at one grievance meeting that when plaintiff was asked by Conalco if he would do the same thing again, he replied that he would respond in the same manner.
 
 
 17
 At the fourth step grievance meeting, which occurred on July 17, 1986, union and Conalco personnel were present and listened to the accounts of the incident by foremen Henthorn and Walls. Walls had observed the incident, but was too far away from Henthorn and plaintiff to overhear anything. The union participants also questioned Henthorn and Walls, looking for inconsistencies in their statements. Plaintiff also gave his account of the incident. He explained his role in the incident by stating that his "father raised no cowards. Put me in a corner and I'll come out fighting." J.A. 816.
 
 
 18
 When Conalco denied plaintiff's grievance at the fourth step of the grievance procedure, the union advanced the matter to arbitration, the fifth and final step of the grievance procedure. Tim Neal, a representative from the international union, District 23, was sent by the district to assist the local in presenting plaintiff's case to the arbitrator. Neal had previously handled approximately 20 to 25 discharge cases in arbitration. Neal met with plaintiff and the members of the Local's grievance committee either three or four times, for a total of about 10 or 12 hours, in preparation for the arbitration hearing.
 
 
 19
 Union committeemen and officers, as well as plaintiff, assisted Neal in preparing for the arbitration hearing. In addition to preparing plaintiff to testify, Neal also prepared Roger Langsdorf, plaintiff's co-worker, to testify. Alan Hunt, a union committee member, also testified at the arbitration hearing in favor of plaintiff, providing testimony about a similar, but not identical, incident at the plant.
 
 
 20
 Further, in preparation for the arbitration hearing, Hunt, who was chairman of the union's grievance committee, undertook a review of the Local's grievance records. He compiled a list of plaintiff's grievances. It was determined that plaintiff filed approximately ten grievances during his nine years of employment at the plant, a number which was not unusual. The union also looked for cases of insubordination and fighting at the plant where the participants were assessed a penalty short of discharge. Two cases were found, but they were not considered to be particularly helpful. Hunt also testified that he questioned a number of maintenance employees seeking evidence of hostility to plaintiff or problems with Henthorn. Hunt asserted that he uncovered nothing useful.
 
 
 21
 Plaintiff testified at length at the arbitration hearing, giving his version of the confrontation with Henthorn, as well as detailing OSHA complaints and grievances he had filed against Conalco in the past. In addition, evidence was submitted that prior to the altercation with Henthorn, plaintiff had taken Clinoril, a prescription pain medication, for shoulder pain and that the side effects of the medicine may have contributed to his actions.
 
 
 22
 At the conclusion of the arbitration hearing, the arbitrator asked plaintiff if he believed he had received a fair hearing. Plaintiff replied that he had, but also told the arbitrator that no matter what the arbitrator decided, he would "go further" with the case. The union filled a post-hearing brief on plaintiff's behalf, which was reviewed and revised by plaintiff prior to its submission to the arbitrator.
 
 
 23
 The arbitrator denied plaintiff's grievance, specifically finding that plaintiff had violated plant rules 1 and 15. The arbitrator also found that plaintiff's testimony was not credible, based upon both plaintiff's demeanor at the hearing and the fact that his testimony was contradictory and vague. Finally, the arbitrator found that mitigation of the discharge penalty was not appropriate in this case, based upon plaintiff's lack of remorse and his failure to accept responsibility for his actions. Plaintiff filed this hybrid action against the union and Conalco following the arbitrator's decision to uphold his discharge.
 
 
 24
 At trial, plaintiff attempted to establish that the union had inadequately prepared for his arbitration hearing. Plaintiff presented the testimony of several co-workers, Keith Crawford, Dan LeMasters, Dan Bartko, Roger Langsdorf and Charles Slonaker, who testified that hourly maintenance workers had all encountered difficulties in receiving orders from more than one foreman. Crawford also testified that foreman Henthorn "hounded" people, and that on occasion he saw Henthorn go face-to-face or belly-to-belly with hourly employees when he was irritated. Crawford also testified that he had previously been told by Henthorn that Henthorn wished there was a way to get rid of plaintiff, because plaintiff kept holding up his shift. LeMasters also described Henthorn as aggressive and as the kind of person that no matter what you did, it was not enough for him. Bartko also described Henthorn as bossy.
 
 
 25
 Plaintiff also testified that during the preparation for the arbitration hearing, Neal never asked for copies of complaints he had filed with OSHA or the Wage and Hour Division of the Department of Labor. However, Neal testified that at the arbitration hearing he did not ask plaintiff about these matters, but that he allowed plaintiff to talk about them during the hearing. Neal further testified that he did not believe that the OSHA or Wage and Hour Division documents were relevant to the arbitration because the only issue was the incident between Henthorn and plaintiff.
 
 
 26
 Finally, plaintiff attempted to establish bias on the part of the union officers towards him. Plaintiff testified that he previously had a disagreement with Gary Cochran, the president of Local Union 5760, concerning an organizing attempt at a hospital in West Virginia. Plaintiff also testified that he had a confrontation with Cochran at a meeting where plaintiff was attempting to organize a federation of local unions.
 
 II.
 A.
 
 27
 Plaintiff argues that the district court erred in refusing to give his proffered jury instructions numbers 1 through 9 to the jury. Plaintiff's proffered jury instructions 1 through 7 and 9 dealt with the issue of the union's duty of fair representation. Plaintiff's proffered jury instruction number 8 dealt with the issue of just cause for plaintiff's termination by Conalco.[1]
 
 
 28
 We review a district court's jury instructions with deference to determine whether, if taken as a whole, they properly appraised the jury of the issues and the applicable law. Tigg Corp. v. Dow Corning Corp., 962 F.2d 1119, 1123 (3d.Cir.), cert. dismissed, 113 S.Ct. 834 (1992); Treadaway v. Societe Anonyme Louis-Dreyfus, 894 F.2d 161, 164 (5th Cir.1990). Further, while the jury instructions must fairly and adequately submit the issues in the case to the jury, a trial judge has broad discretion concerning the particular language used in a jury instruction. Reversal is appropriate only if the jury instructions, when considered as a whole, were confusing, misleading, or prejudicial. Leila Hosp. & Health Ctr. v. Xonics Medical Sys., Inc., 948 F.2d 271, 277 (6th Cir.1991) (citing Beard v. Norwegian Caribbean Lines, 900 F.2d 71, 72-73 (6th Cir.1990)). "The 'critical inquiry is whether the instructions as a whole provide the jury with sufficient guidance concerning the issues to be tried.' Even a charge that contains an 'inaccurate or ambiguous statement does not constitute reversible error if the inaccuracy or ambiguity is unlikely to mislead the jury.' " Bagherzadeh v. Roeser, 825 F.2d 1000, 1003 (6th Cir.1987) (quoting Teal v. E.I. DuPont de Nemours & Co., 728 F.2d 799, 802 (6th Cir.1984)).
 
 
 29
 At the outset, we note that plaintiff's counsel did not object to the district court's failure to give proposed jury instruction number 8, and thus, has failed to preserve that issue for appellate review. See Woodbridge v. Dahlberg, 954 F.2d 1231, 1235 (6th Cir.1992) (appellant failed to object to the district court's failure to include certain language in its jury instructions and, therefore, cannot raise the issue on appeal).
 
 
 30
 In his objections to the district court's proposed jury instructions, plaintiff's counsel made various objections to the district court's decision not to give portions of his proposed jury instructions concerning the union's duty of fair representation; however, plaintiff's counsel voiced no objection to the district court's rejection of the proffered instruction concerning just cause for plaintiff's termination. Under these circumstances, we hold that plaintiff has failed to preserve the issue of the district court's rejection of proffered jury instruction number 8 for appellate review.
 
 
 31
 With regard to the plaintiff's challenge to the district court's failure to give his proffered jury instructions concerning the union's duty of fair representation, even if we were to assume arguendo that the jury instructions concerning the union's duty of fair representation were erroneous, such error would be harmless because the jury was not required to deliberate on that issue.
 
 
 32
 The burden of proof lies with the plaintiff in a hybrid Sec. 301 action. Ryan v. General Motors Corp., 929 F.2d 1105, 1109 (6th Cir.1989) (citing DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 165 (1983)). In order to prevail against either the company or the union in a hybrid Sec. 301 action, a plaintiff must not only show that his discharge was contrary to the collective bargaining agreement, he must also show a breach of the duty of fair representation by the union. Id.; accord Linton v. United Parcel Serv., 15 F.3d 1365 (6th Cir.1994); Adkins v. International Union of Elec., Radio & Mach. Workers, 769 F.2d 330, 336 (6th Cir.1985).
 
 
 33
 In this case, the jury found that there was just cause for plaintiff's termination; i.e., that Conalco did not breach the collective bargaining agreement when it terminated plaintiff. Thus, in accordance with the instructions the jury received, they were not required to consider the issue of whether the union breached its duty of fair representation in their deliberations. Therefore, even in the absence of plaintiff's proffered jury instructions, the district court's jury instructions concerning the union's duty of fair representation could not have been misleading to the jury. Thus, we conclude that the district court's decision not to give plaintiff's proffered jury instructions 1 through 7 and 9 was not reversible error.
 
 B.
 
 34
 Plaintiff also argues that the district court erred in refusing to admit several exhibits offered by his counsel into evidence. Specifically, plaintiff asserts that the district court erred when it excluded his proffered exhibits 3, 6, 7, and 8.[3]
 
 
 35
 Plaintiff's exhibit number 3 was entitled "Maintenance Department Practice Guidelines, 90 Day Trial Basis Beginning at 12:01 a.m., October 4, 1982." Plaintiff's exhibit number 7 was entitled "Interoffice Memo, August 10, 1979 from John D. Schmidt To: Maintenance Supervision, Subject: Work Practices-Foreman." Plaintiff sought to introduce both documents on the grounds that they were probative of his duty to continue with his assigned task at melter 7, rather than to assist in changing the molds in pit number 3.
 
 
 36
 The district court sustained objections to both documents on the grounds that there was no evidence that the documents were in effect on June 25, 1986, that the documents were of little probative value, and that they might confuse the jury. The district court also found that document number 7 had not been properly authenticated.
 
 
 37
 Plaintiff's proposed exhibit number 6 was a grievance drawn up by plaintiff in May 1983 and given to a union official. According to plaintiff, he never received a response to the grievance. The district court found that exhibit 6 was inadmissible because there was no evidence it was ever submitted to Conalco.
 
 
 38
 Plaintiff's proposed exhibit number 8 is a Conalco memorandum dated August 12, 1980, dealing with problems occurring in shift changes. A problem with shift changes was the basis for a complaint which plaintiff filed with the Wage and Hour Division of the United States Department of Labor in March 1983. The district court excluded this exhibit on the grounds that there was no evidence that the document was still in effect in June 1986 and because it had not been properly authenticated.
 
 
 39
 "The trial judge has, and must have, broad discretion in the conduct of a trial. Rulings on the relevancy and materiality of evidence may not be disturbed on appeal in the absence of a showing of clear abuse of discretion." Geisler v. Folsom, 735 F.2d 991, 997 (6th Cir.1984). Under Federal Rule of Evidence 401, "proffered evidence must be relevant to prove a proposition that is itself 'of consequence to the determination of the action,' i.e., material to the lawsuit." United States v. Fountain, 2 F.3d 656, 667 n. 6 (6th Cir.), cert. denied, 114 S.Ct. 608 (1993). Further, the determination of the adequacy of the foundation for the admission of evidence is also left to the discretion of the trial court. United States v. Carranco, 551 F.2d 1197, 1199 (10th Cir.1977).
 
 
 40
 Once a district court decides that evidence is relevant under Rule 401, it then must decide whether the evidence is excludable under Fed.R.Evid. 403 which provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." United States v. Hawkins, 969 F.2d 169, 174 (6th Cir.1992) (per curiam), cert. denied, 113 S.Ct. 1021 (1993); Schrand v. Federal Pac. Elec. Co., 851 F.2d 152, 156 (6th Cir.1988). Finally, even where this court concludes that a lower court's decision to admit or exclude evidence amounts to an abuse of discretion, the decision will not be disturbed on appeal if it did not result in a substantial injustice. Zamlen v. City of Cleveland, 906 F.2d 209, 216 (6th Cir.1990), cert. denied, 499 U.S. 936 (1991).
 
 
 41
 In this case, the district court did not commit an abuse of discretion, much less a substantial injustice, in refusing to admit defendant's four proffered exhibits. All of the documents pertained to a time period prior to the incident at issue in this case. Moreover, there was no showing that the rules or work practices set forth in exhibits 3 and 7 were in effect on June 25, 1986. Further, there was no evidence that the grievance in exhibit 6 was ever presented to Conalco. Although plaintiff now argues that the failure to process his grievance in May 1983 shows bias or hostility on the part of the union in June 1986, we cannot say that the district court's exclusion of this evidence was an abuse of discretion in view of the three-year period separating the events.
 
 
 42
 Likewise, exhibit 8 is dated nearly six years before the incident in question. Plaintiff testified that the exhibit dealt with the day shift working hours at the plant, 8:00 a.m. to 4:00 p.m. This has nothing to do with the incident on June 25, 1986, and there is a significant potential of confusion of the issues by the jury if this evidence were admitted. Thus, the exclusion of this evidence was not an abuse of discretion.
 
 C.
 
 43
 Finally, plaintiff argues that the district court committed reversible error by restricting the scope of his direct examination of some of his own witnesses and the cross-examination of defendant's witnesses. Specifically, plaintiff complains that fifteen rulings of the district court were erroneous. As set forth in subsection B above, this court reviews a district court's evidentiary rulings for an abuse of discretion, and this court finds reversible error when the district court's rulings result in a substantial injustice. Zamlen, 906 F.2d 216; Geisler, 735 F.2d at 997.
 
 
 44
 (1)
 
 
 45
 Plaintiff complains that the district court excluded evidence he sought to elicit from foreman Keith Yoho concerning the demeanor of John Schmidt, plaintiff's supervisor, on June 25, 1986. In this case, the district court excluded questions to Yoho concerning the demeanor of Schmidt on the grounds that the danger of confusion outweighed the probative value of the testimony under Fed.R.Evid. 403. Yoho testified that he and Schmidt had a disagreement in the early 1980's; however, because plaintiff's counsel could not connect this incident to the events of June 25, 1986, the district court's ruling was not an abuse of discretion.
 
 
 46
 (2)
 
 
 47
 Plaintiff complains that the district court improperly sustained an objection to a question he propounded to Alan Hunt, a union official. Hunt was asked if the union had investigated the specifics of complaints which plaintiff had filed with OSHA and the Wage and Hour Division. Hunt replied that the union investigated the complaints and "felt they were of no value to the case." J.A. 332. Plaintiff's counsel then asked, "[t]he fact that the company may want to discharge [plaintiff] for filing OSHA complaints or wage and hour complaints you believe was of no relevancy to the reason why they fired him?" J.A. 332-33. This drew an objection which was sustained on the ground that there was no evidence that Conalco sought to terminate plaintiff for filing complaints. Here, the district court's ruling was not an abuse of discretion. Not only did the question from plaintiff's counsel misstate Hunt's prior testimony, there was no evidence that Conalco sought to terminate plaintiff for any reason other than the insubordination which occurred on June 25, 1986.
 
 
 48
 (3)
 
 
 49
 Plaintiff complains that he was not permitted to ask Hunt why the union did not call John Schmidt to testify at the arbitration hearing. Hunt testified that Schmidt was not interviewed by the union and therefore did not testify at arbitration. Plaintiff's counsel then asked Hunt, "What if you interviewed Mr. Schmidt and you found that Mr. Henthorn was lying about having talked to him?" J.A. 361-62. The district court sustained an objection to this question on the ground that it was speculative. However, after the objection was sustained, plaintiff's counsel rephrased his question and elicited the testimony which he sought. Thus, no abuse of discretion occurred.
 
 
 50
 (4)
 
 
 51
 Plaintiff asserts that his counsel was improperly restricted in his attempt to question Hunt about whether one of his children was employed at Conalco after plaintiff's termination. The district court sustained the objection by defendants to the question by plaintiff's counsel. Plaintiff argues that showing that the children of union officials were hired by Conalco after plaintiff's termination would show bias or hostility against plaintiff on the part of the union. However, the district court properly sustained the objection to this question under Fed.R.Evid. 403. The probative value of the employment status of the offspring of union officials would clearly be outweighed by the dangers of confusion of the issues and prejudice to the defendants.
 
 
 52
 (5)
 
 
 53
 Plaintiff asserts that his counsel was improperly foreclosed from showing that two union officials, Hunt and Cochran, would have been considered for the position of Conalco's Labor Relations Superintendent after Earl Petty, who held the position, retired. When Petty was asked whether Hunt or Cochran would be considered for his position when he retired, Conalco's counsel objected. However, before the objection could be sustained by the district court, Petty answered the question. He stated that he had no idea whether Hunt or Cochran would be considered for his position. Thus, no abuse of discretion occurred as the result of the district court's ruling.
 
 
 54
 (6)
 
 
 55
 Plaintiff also asserts that his counsel should have been permitted to ask Petty whether another supervisor at Conalco, Mr. Merritt, had been fired by another company for lying. An objection to the question was sustained on the grounds that of relevance. Plaintiff asserts that he was trying to challenge Merritt's credibility; however, Merritt was not a witness at trial. Moreover, it is not clear from the record what role, if any, Merritt played in the decision to suspend or discharge plaintiff. Thus, the district court did not abuse its discretion because there was no showing that the question was relevant.
 
 
 56
 (7)
 
 
 57
 Plaintiff also asserts that his counsel should have been permitted to ask Tim Neal why Neal, who represented plaintiff at the arbitration hearing, felt it was not relevant to have other maintenance employees testify at the arbitration hearing concerning problems they experienced with receiving instructions from both maintenance and production supervisors. Plaintiff's counsel asked Neal if he felt such witnesses were irrelevant. An objection to the question was sustained on the ground that it was argumentative. Further, before the objection was sustained, Neal responded that it was irrelevant. After the objection was sustained, plaintiff's counsel rephrased his question and Neal again answered that it was irrelevant. Thus, there was no abuse of discretion because plaintiff's counsel was able to elicit the testimony he wanted.
 
 
 58
 (8)
 
 
 59
 Plaintiff next asserts that his counsel should have been permitted to ask a co-worker, Mr. Crawford, whether Crawford felt that Conalco's management harbored ill will against him. An objection to the question was sustained on the ground that it called for an opinion about the state of mind of the company. In this case, Crawford was permitted to testify that Henthorn and another foreman, Workman, had threatened him with discharge. Thus, no abuse of discretion occurred because Crawford's testimony was sufficient to permit the jury to determine whether Conalco harbored any ill will against Crawford.
 
 
 60
 (9)
 
 
 61
 Plaintiff also asserts that Crawford was not permitted to give his opinion as to whether Conalco wished to fire plaintiff or whether Cochran, the union president, liked or disliked plaintiff. In this case, the district court did not permit Crawford to give his opinion; however, Crawford was freely permitted to testify as to facts or observations he had regarding Conalco's and Cochran's attitudes towards plaintiff. Thus, no abuse of discretion occurred because the jury, without Crawford's opinion, had sufficient testimony before them which would allow them to make a determination about Conalco's and Cochran's attitudes.
 
 
 62
 (10)
 
 
 63
 Plaintiff further asserts that Crawford should have been permitted to testify that in Crawford's opinion the fact that Conalco paged plaintiff an inordinate number of times on June 25, 1986, indicated that Conalco was seeking grounds to fire plaintiff. Again, the district court permitted Crawford to testify as to any facts or observations that supported plaintiff's contention that either Conalco or the union wanted to "get him." As before, there was no abuse of discretion because the jury was capable of drawing its own conclusion about Conalco's or the union's intentions based upon the testimony presented, and the jury did not need Crawford's interpretation to reach a conclusion.
 
 
 64
 (11)
 
 
 65
 Plaintiff asserts that his counsel was erroneously foreclosed from asking a witness, Danny LeMasters, what questions LeMasters had asked Alan Hunt, a union official, about the union's representation of plaintiff at the arbitration hearing. The district court permitted LeMasters to testify as to any statements which Hunt made to him concerning the union's representation of plaintiff. However, Hunt was not permitted to state what questions he had actually asked Hunt. Here, plaintiff was able to elicit Hunt's admissions concerning the union's representation of plaintiff, and no abuse of discretion occurred.
 
 
 66
 (12)
 
 
 67
 Plaintiff also complains that a witness, Daniel Bartko, was not permitted to tell the jury about statements which maintenance foreman Schmidt made about production foremen. The objection was sustained on the basis of relevancy. Plaintiff was able to elicit testimony from Bartko, as well as himself and Roger Langsdorf, regarding Schmidt's general demeanor. This testimony supported plaintiff's assertion that had he followed Henthorn's instructions on June 25, 1986, he would have encountered trouble with Schmidt. Thus, plaintiff has shown no abuse of discretion in the exclusion of general statements Schmidt may have made about production foremen.
 
 
 68
 (13)
 
 
 69
 Plaintiff also contends that the district court erroneously sustained an objection to a question proffered to Roger Langsdorf. Langsdorf testified that maintenance employees would occasionally be called off a job and given another assignment by production foremen. Plaintiff's counsel then asked, "So that I understand your testimony as to the nature of the problem in the plant, prior to June 25, 1986, you had difficulties in determining who you worked for, maintenance or production, correct?" J.A. 273. Conalco's counsel objected on the ground that Langsdorf had not testified that he had difficulty determining who he worked for, and the objection was sustained. Plaintiff's counsel then rephrased the question: "The conflict, Mr. Langsdorf, was you doing a job and a production person pulling you off of that job; correct?" J.A. 273. Langsdorf responded in the affirmative. Thus, there was no abuse of discretion. Counsel's question did misstate Langsdorf's response, and after rephrasing the question he was able to elicit the testimony he wanted.
 
 
 70
 (14)
 
 
 71
 Plaintiff argues that he was not permitted to testify whether his name could be released to his employer as the person who filed a complaint with OSHA or the Wage and Hour Division. However, plaintiff testified that his name was released to Conalco with respect to the complaints he filed with OSHA and the Wage and Hour Division. In this instance, Conalco did object and the objection was sustained; however, once plaintiff's counsel rephrased the question, plaintiff gave the exact testimony his counsel intended him to give. Thus, there was no error.
 
 
 72
 (15)
 
 
 73
 Finally, plaintiff contends that the district court erred in excluding his testimony concerning exhibit 3. Exhibit 3, as described above, was the 90-day work practice guideline which was dated 1982. Plaintiff wanted to testify that it was his opinion that the work practice guideline set forth in exhibit 3 was in effect in 1986. An objection to this testimony was made and sustained on the basis that the document spoke for itself as to when it was in effect. Further, as stated above, the district court subsequently properly determined that exhibit 3 should not be admitted into evidence. Further, although plaintiff argues that this testimony would have related to the issue of maintenance employees being pulled off of assigned tasks by production foremen, plaintiff concedes that there was other testimony on this point. Thus, no abuse of discretion occurred.
 
 III.
 
 74
 For the reasons stated, the district court is AFFIRMED.
 
 
 
 *
 Honorable William H. Timbers, Senior United States Circuit Judge for the Second Circuit, sitting by designation
 
 
 [1]
 Although defendants Local 5760 and District 23 filed a cross-appeal (No. 92-4346), the union defendants have withdrawn their cross-appeal in their brief on appeal. Brief of Union Appellees and Cross-Appellants at 40
 
 
 [1]
 This is plaintiff's description of his proffered jury instructions. No complete text of plaintiff's proffered jury instructions appears in the record, although partial texts of the jury instructions--the first sentence of each proffered instruction--appear in the record. J.A. 775-783. Further, the district court's docket sheet indicates that proposed instructions 1, 2, and 3 were entered into the record; however, it is not clear that these are the same instructions at issue here. Although plaintiff asks this court to review these proffered jury instructions, he has failed to set forth these instructions in his brief on appeal
 
 
 [3]
 Again, these documents are not part of the record, and we must rely on the parties' description of these documents in reviewing this issue