**BLUE RIDGE BANK,**
**Plaintiff–Appellee,**

v.

**VERIBANC, INC., Defendant–Appellant.**

**BLUE RIDGE BANK,**
**Plaintiff–Appellant,**

v.

**VERIBANC, INC., Defendant–Appellee.**

Nos. 87–2213, 87–2223.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 6, 1988.
Decided Jan. 20, 1989.

L. Thompson Hanes (John L. Cooley, Fox, Wooten & Hart, P.C., Roanoke, Va., on brief), for defendant-appellant.

James W. Haskins (Robert L. Bushnell, Young, Haskins, Mann & Gregory, P.C., Martinsville, Va., on brief), for plaintiff-appellee.

(Ronald L. Plesser, Robert G. Berger, Nash, Railsback & Plesser, Washington, D.C., Henry R. Kaufman, Robert D. Sack, Gibson, Dunn & Crutcher, on brief), for amici curiae Information Industry Ass'n and Dow Jones & Co., Inc.

Before WINTER, Chief Judge, SPROUSE and WILKINS, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

This is a diversity action arising from the alleged libel of Blue Ridge Bank by Veribanc, Inc. Blue Ridge Bank is a full-service banking institution located in Floyd County, Virginia, and Veribanc is a Massachusetts corporation engaged in the generation and dissemination of information concerning financial institutions based on data submitted to federal regulatory agencies. Following a jury trial, the district court entered judgment for plaintiff in the amount of $600,000. Defendant appeals the liability determination and the assessment of damages, and plaintiff cross-appeals the district court's ruling that it is a

"public figure" required to prove actual malice or recklessness on the part of the defendant. Because we conclude that Blue Ridge Bank was not a public figure and was therefore only required to prove negligence on the part of Veribanc, we affirm.

## I.

Blue Ridge Bank is one of two banks located in Floyd County, Virginia. It was chartered on November 18, 1982, and is the successor to Blue Ridge Savings & Loan which had operated in Floyd County since 1978. After November 18, 1982, Blue Ridge was required to file "call reports" each quarter with the Federal Reserve Board (FRB) which, in turn, creates a unified data base covering the nation's banks. Call reports contain a variety of financial data reflecting both the bank's operating performance and capital structure.

Veribanc is a gatherer, processor, and distributor of information concerning a variety of financial institutions including banks, savings and loan associations, and credit unions. Under the Freedom of Information Act, Veribanc obtains "tightly packed" magnetic tapes containing the call report data for approximately 35,000 financial institutions each quarter of the year. Veribanc typically receives the magnetic tapes approximately four months after the close of the quarter for which the call report is submitted.

Veribanc then decodes the tape and loads the information into its own data base. Once in its data base, Veribanc is able to retrieve and manipulate the data to generate various standardized and customized reports for its customers. One of the thirty-five standard reports generated by Veribanc is titled "Federally Insured U.S. Commercial Banks Which Could Reach Zero Equity Within One Year" (hereafter "List Series Report"). This List Series Report was available to the general public for about $30.00 in 1983.[1]

In early 1983, Veribanc was contacted by Dan Dorfman, a nationally syndicated newspaper columnist, who inquired about the number and location of the banks projected to reach zero equity within the year. Dorfman had written one previous article based on a Veribanc report regarding the growing number of insolvent banks, and was doing an update on that story. Veribanc supplied Dorfman with a copy of its most recent List Series Report on May 18, 1983 without charge. In exchange, Veribanc expected to be cited as the source of information. By separate cover letter, Veribanc stressed the need for balanced reporting and the need to include various caveats regarding proper interpretation of the report. These caveats are also printed on the back of each page of the List Series Report itself.

The List Series Report furnished to Dorfman identified Blue Ridge Bank as one of 126 banks "which could reach zero equity within one year." The article Dorfman sent to the syndicated newspapers was edited substantially by the *Richmond Times Dispatch* (*RTD*), which published it on May 22, 1983. The article published by the *RTD* was titled "Possible bank flops listed," and included Blue Ridge Bank as one of five banks in an accompanying table denominated "A partial list of troubled banks." The five banks included in the table were apparently considered to be of local interest by the *RTD* editors. No other reference to Blue Ridge Bank was made.

It is undisputed that Blue Ridge Bank was mistakenly included in the List Series Report. In order to generate its report, Veribanc "annualizes" the net income for the most recently reported quarter for each bank and then compares the projected per-month loss with each bank's reported equity. If the projected per-month rate of loss would consume the bank's reported equity within twelve months from the time of publication, then the bank is included in the report.

A more detailed explanation of these calculations is necessary to understand the nature of Veribanc's error and our disposition of the case. Banks themselves calcu-

---

**1.** Among Veribanc's regular customers are the Federal Deposit Insurance Corporation, U.S. Senate Banking Committee, and various state regulatory authorities.

late their net gain or loss as part of the information supplied the FRB in the quarterly call reports. The net gain or loss is listed as a year-to-date figure. In order for Veribanc to annualize a bank's most recent quarterly performance, it is first necessary to calculate the bank's net income for the most recently reported quarter. This is accomplished by comparing the most recently reported year-to-date net income figure with that listed in the previous quarter's call report. Once a quarterly net loss is established, that loss is multiplied by four ("annualized net income") and then divided by twelve to obtain a projected monthly rate of loss if the bank's performance in the reported quarter were to continue. Finally, Veribanc divides the bank's reported equity by the projected monthly rate of loss to determine the number of months before the bank would reach zero equity. This number is, in turn, reduced by four to reflect the time lag between the close of the reported quarter and the generation of data by Veribanc.

This methodology produced the following figures for Blue Ridge Bank based on its call report for the fourth quarter of 1982. First, Veribanc's computer correctly identified the reported year-to-date loss as $119,000. Because Blue Ridge Bank had never sent a call report to the FRB, there was no previously reported quarterly data with which to compare this figure and Blue Ridge was perceived to have sustained the $119,000 loss entirely in the fourth quarter. The annualized net loss was then calculated as $476,000 leading to a projected monthly rate of loss of $38,167. At that rate, the reported equity of $558,000 would be consumed within 15 months. Reduction of this period by four months to account for the delay in access to the information resulted in a projection that Blue Ridge Bank's equity would be consumed within one year from the date of publication.

The source of error underlying Blue Ridge Bank's inclusion is now clear. The year-to-date net loss figure reported by Blue Ridge Bank included its operating performance as a savings and loan institution prior to November 18, 1982.[2] Accordingly, the "annualized net loss" and other calculations (including the "projected months until zero equity") painted a picture of financial health significantly more bleak than the reality. Although conversions from savings and loan associations to banks are now more common, Blue Ridge was the first such conversion in Virginia, and apparently only the third or fourth in the country since 1966.

Testimony at trial established that neither the call report filed with the FRB nor the magnetic tapes received by Veribanc explicitly identified Blue Ridge Bank as a recently converted institution. However, there was also testimony indicating that portions of the call report data received by Veribanc were illogical and unreasonable absent some operations predating the fourth quarter of 1982. Veribanc made no inquiries of Blue Ridge Bank at any time prior to publishing the List Series Report.

Fortunately, publication of the *RTD* article indicating that Blue Ridge Bank was possibly on the road to insolvency did not lead to a run on the bank, but it did result in a great deal of concern in Floyd County about the financial health of the institution. Blue Ridge Bank sued Veribanc for libel seeking a total of $3,000,000 in compensatory and punitive damages. Following a jury trial, it was awarded $600,000 in compensatory damages with no punitive damages. On appeal, Veribanc attacks the legal basis for both the judgment and the award of damages.

## II.

■ Blue Ridge Bank claims to have been libeled by Veribanc's inclusion of it in the List Series Report. Specifically, Blue Ridge identifies the figures for "annualized net income" and "projected months until zero equity" as factually incorrect, and argues that Veribanc's representation that these figures are "based on Federal Re-

---

**2.** There is no question that Blue Ridge Bank followed then-existing reporting requirements in combining its banking and savings and loan performances. FRB reporting regulations were subsequently amended to avoid the "mixing" of this data.

serve Reports of Condition and Reports of Income" is deliberately misleading and contrary to fact. Blue Ridge Bank contends that the concepts of "annualization" and "months until zero equity" as well as the reported figures are entirely the creation of Veribanc and are not derived from the call report.

■ Initially, we must decide whether Blue Ridge Bank may properly maintain an action for libel under the circumstances: "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Welch,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). Thus, if the defamatory statement is an expression of opinion rather than a declaration of fact, then it is constitutionally protected under the First Amendment and judgment should be entered for the defendant. *Potomac Valve & Fitting, Inc. v. Crawford Fitting Company,* 829 F.2d 1280 (4 Cir.1987).

In *Potomac Valve* we set forth a two part test involving a consideration of four factors to determine whether a defamatory statement is one of fact or opinion. Drawing heavily on *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) (en banc), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), we declared that the threshold inquiry is whether the challenged statement can be objectively characterized as true or false. If the statement cannot be so characterized, it is not actionable, but if the challenged statement can be so characterized, then three additional factors must be considered to determine whether the statement is nevertheless an opinion be-

cause "a reasonable reader or listener would recognize its weakly substantiated or subjective character—and discount it accordingly." *Potomac Valve,* at 1288. These additional factors are the author or speaker's choice of words; the context of the challenged statement within the writing or speech as a whole; and the broader social context into which the statement fits. *Id.,* at 1287–88.

We have no difficulty concluding that the challenged statements in this case are objectively characterizable as true or false: either the numbers reported for "annualized net income" and "projected months until zero equity" were accurate or they were not.[3]

Therefore, we turn our attention to the remaining factors identified in *Ollman* and adopted in *Potomac Valve.* First, the words employed by Veribanc were neither hyperbolic nor incapable of precise meaning so as to alert the reader that the statements were something other than factual declarations.[4] Second, examination of the statements in the context of the article as a whole reveals only that the validity of the projections is dependent upon the timeliness and accuracy of the information in the call reports. An interpretation of the statements in the context of the List Series Report as a whole, including its caveats and disclaimers, does not suggest an alternative meaning for the challenged statements or that the projection is a mere "hunch" based on the author's review of the relevant data.[5] Finally, consideration of the broader social context in which the statements are made offers no solace to Veribanc. There is nothing to suggest the

3. The List Series Report does not contain an explanation of the meaning of "annualized net income." It does explain that "projected months until zero equity" is based on continuing losses at the same rate as during the indicated fiscal period. We do not find anything inherently deceptive in these concepts, and accept Veribanc's explanation of how these numbers are generated. Blue Ridge Bank has accepted this explanation also, although it continues to argue the "annualization" of quarterly financial data is inherently deceptive and improper. We perceive no need to address this contention.

4. "The truth or falsity of the statement does not depend upon subjective values or indefinite terms." *Potomac Valve,* at 1289 (citation omitted). *See also* cases and discussion in *Potomac Valve,* at 1287 n. 21.

5. We specifically reject Veribanc's argument that any projection is incapable of being classified as a factual statement. Describing an event as being conditional upon the occurrence of another event or the existence of an additional circumstance does not automatically convert that description into an opinion where it is otherwise verifiable and plausible.

inherent unreliability of Veribanc or the existence of a relationship between Veribanc and Blue Ridge Bank which would alert the reader to be aware of distortions and exaggerations.

Thus, we conclude that the challenged statements were factual and an action for libel based on their injurious effect is not barred by the First Amendment.

## III.

■ Next, we must determine the appropriate standard for imposing liability under the circumstances of this case. This determination requires us to consider both whether the defamatory speech involves a matter of legitimate public concern and whether Blue Ridge Bank is a public or private figure. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986). Because of the obvious importance of banks to the financial health of our communities and the historic governmental interest in the operations and solvency of these institutions, we have no difficulty concluding that Veribanc's statements relate to a matter of public concern.[6]

■ We turn our consideration then to the question of whether Blue Ridge Bank is a public or a private figure. Public figures may not recover in a libel action absent clear and convincing proof of actual malice or of reckless disregard of the truth on the part of the speaker or publisher of the false statements. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Gertz,* 418 U.S. at 342, 94 S.Ct. at 3008. State law continues to govern the standard of liability in cases involving the defamation of private figures. *Gertz,* 418 U.S. at 347, 94 S.Ct. at 3010. Under Virginia law, private figure plain-

tiffs must prove negligence by a preponderance of the evidence in order to recover compensatory damages. *Gazette v. Harris,* 229 Va. 1, 325 S.E.2d 713, *cert. denied,* 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643, 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed. 2d 653 (1985).

The district court ruled that Blue Ridge Bank was a public figure and therefore required it to prove actual malice or reckless disregard of the truth. The district court's ruling rested on three considerations: (1) that in connection with its conversion from a savings and loan association, Blue Ridge Bank had "thrust itself into the public eye" and "assumed the accompanying risk,"[7] (2) that Blue Ridge Bank is part of a heavily regulated industry reflecting its public importance and is one of only two financial institutions in Floyd County; and (3) that Blue Ridge Bank had demonstrated access to the media.

In *Gertz,* the Supreme Court drew a distinction between public and private figures based on two considerations: the plaintiff's access to the media, and the extent to which the plaintiff, by virtue of his position in the community or involvement in a particular matter of public concern, can be said to invite public comment and attention. The Court noted that the second of these two considerations was the more important. *Gertz,* 418 U.S. at 344–45, 94 S.Ct. at 3009–10.

Explaining this "invitation of public comment" consideration more fully, the Court further distinguished between those public figures who assume a general risk of defamatory comment and those who assume such a risk with respect to only certain topics:

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More com-

---

6. "[W]hether speech addresses a matter of public concern must be determined by the expression's content, form, and context as revealed by the whole record." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* 472 U.S. 749, 761, 105 S.Ct. 2939, 2946, 86 L.Ed.2d 593 (1985) (citation omitted).

7. These descriptions are drawn from *National Foundation for Cancer Research v. Council of Better Business Bureaus,* 705 F.2d 98 (4 Cir.), *cert. denied,* 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983) and *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264 (3 Cir.1980), respectively.

monly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.

418 U.S. at 351, 94 S.Ct. at 3013.

Thus, we must determine whether the circumstances of this case support the conclusion that Blue Ridge Bank was either a public figure in all contexts or a public figure for a limited range of issues. The district court did not say whether it considered plaintiff a general or limited-purpose public figure, so we will consider both possibilities.

■ A general purpose public figure is one who occupies a position "of such persuasive power and influence" and "pervasive fame or notoriety" in the community that he assumes "special prominence in the resolution of public questions" and "in the affairs of society." *See Gertz* at 345, 351, 94 S.Ct. at 3009, 3013. The attainment of general public figure status is not to be lightly assumed, even if the plaintiff is involved in community affairs, and requires clear evidence of such stature. *Id.* at 352, 94 S.Ct. at 3013. We recognize, as did the district court, that Blue Ridge Bank occupies a position of considerable importance in the economy of Floyd County. However, we find no evidence to suggest that Blue Ridge Bank enjoys either the widespread power or pervasive influence necessary to affect the resolution of public issues in a manner which elevates it to a general purpose public figure. Thus, we conclude the district court's requirement that Blue Ridge Bank establish actual malice or recklessness could only be proper if plaintiff is properly viewed as a limited-purpose public figure.

In *National Foundation for Cancer Research v. Council of Better Business Bureaus,* 705 F.2d 98 (4 Cir.), *cert. denied,* 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110

(1983) ("NFCR"), we considered the question of whether the plaintiff was properly characterized as a limited-purpose public figure.[8] We stated that under *Gertz,* "the key to determining whether a party is a public figure is the party's own conduct," and cited the following passage:

> It is preferable to reduce the public figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation. [418 U.S. at 352, 94 S.Ct. at 3013]

*NFCR* at 101.

In that case we concluded that the plaintiff was a limited-purpose public figure because "[t]he evidence is uncontroverted that the Foundation had thrust itself into the public eye, not only through its massive solicitation efforts ... but also through the claims and comments it made in many of these solicitations where it extolled its judicious use of donated funds...." *Id.* Central to our conclusion was both the presence of extensive advertising (creating a high public profile and demonstrating media access) and a direct relationship between the promotional message and the subsequent defamation (indicating plaintiff's pre-existing involvement in the particular matter of public concern and controversy).[9]

On appeal, Veribanc argues that Blue Ridge Bank engaged in an extensive promotional campaign at the time of its conversion thereby making the case analogous to *NFCR.* However, unlike the factual pattern in *NFCR,* there is no evidence to suggest that Blue Ridge Bank ever raised the issue of its corporate financial health—the subject of Veribanc's report—as part of its promotional efforts or that Veribanc's consideration of Blue Ridge Bank's financial health was in any way prompted by

---

**8.** In *NFCR,* the percentage of charitable donations used by the plaintiff for administrative and fund raising expenses was criticized by the defendant.

**9.** See also *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 273–74 (3 Cir.1980), in which the

Third Circuit first rejected the possibility that the plaintiff was a general purpose public figure, but concluded that it was a limited purpose public figure based on the extent and content of its advertising.

this advertising.[10]  Thus, we perceive no grounds for finding plaintiff a limited purpose public figure in the mold of *NFCR*.

There is, of course, the alternative possibility that Blue Ridge Bank voluntarily injected itself or was drawn into a pre-existing controversy concerning its financial health that was not of its own making.  In this regard, Veribanc points to the plaintiff's participation in a government regulated industry of national economic importance, and the fact that plaintiff is intimately involved in the economic welfare of Floyd County as one of only two local banks.

We cannot accept the proposition, tacitly adopted in some jurisdictions, that a business enterprise loses much of the protection afforded by the traditional law of defamation simply as a result of being subject to pervasive governmental regulation.[11]  We do not believe that the existence of an ongoing public interest in the stability of society's financial institutions and markets, or in the supervision of the gaming industry, or in the regulation of utilities automatically elevates every member of the regulated class to public figure status.  Such an approach would effectively collapse the Court's dual inquiry, prescribed in *Gertz*, regarding the subject matter of the publication (i.e., whether it is

a matter of public concern) and the status of the defamed entity into a single consideration: a result which has been rejected by the Court in decisions following *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).  *See e.g., Gertz, supra; Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

Rather, we think that in this context, as in others, a plaintiff should not be considered a limited-purpose public figure absent the existence of a pre-defamation public controversy in which the plaintiff has become directly involved.[12]  When these first two conditions are satisfied, the plaintiff is a public figure with respect to those statements that are directly relevant to its involvement in the identified controversy.  In this case, there simply was no specific pre-existing public controversy directly or proximately concerning Blue Ridge Bank's solvency.

Ironically, the vulnerability of banks and savings and loan associations to runs on deposits both supports regulation of the industry and suggests the imprudence of automatically elevating the standard of proof for recovery in defamation cases involving such institutions.  Absent involve-

---

**10.**  Blue Ridge Bank argues that its promotional effort did not rise to the magnitude of the efforts present in *NFCR* or *Steaks Unlimited.*  Our resolution of this issue does not turn on the extent of defendant's advertising effort and accepts as a fact that Blue Ridge Bank enjoys a relatively high public profile in Floyd County.  It is the absence of a correlation between plaintiff's promotional efforts and defendant's publication that is determinative.

**11.**  *See e.g., Coronado Credit Union v. KOAT Television, Inc.*, 99 N.M. 233, 241, 656 P.2d 896, 904 (1982) (state chartered credit union is functionally equivalent to a bank and was a "public figure" because such institutions are affected with a public interest); *American Benefit Life Ins. Co. v. McIntyre*, 375 So.2d 239, 242 (Ala. 1979) (insurance company is a public figure because closely regulated by the government and is "clothed with the public interest"); *Reliance Ins. Co. v. Barron's*, 442 F.Supp. 1341, 1348 (S.D.N.Y.1977) (insurance company plaintiff is a general purpose public figure based, among other factors, upon state regulation of

the industry); *But compare Bank of Oregon v. Independent News*, 298 Or. 434, 693 P.2d 35, 42, cert. denied, 474 U.S. 826, 106 S.Ct. 84, 88 L.Ed. 2d 69 (1985) (bank not a public figure absent a pre-existing public controversy); *Sisler v. Gannett Co., Inc.*, 104 N.J. 256, 516 A.2d 1083, 1090 (1986) (former bank president not a public figure in an action based on article questioning propriety of certain bank loans).

**12.**  A public controversy has been defined as " 'a real dispute, the outcome of which affects the general public or some segment of it.' " *McDowell v. Paiewonsky*, 769 F.2d 942, 948 (3 Cir. 1985), quoting *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C.Cir.), cert. denied, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980).  The plaintiff's involvement in the controversy must be more than tangential.  *See e.g., Wolston v. Reader's Digest Ass'n., Inc.*, 443 U.S. 157, 167–68, 99 S.Ct. 2701, 2707–08, 61 L.Ed.2d 450 (1979); *Arctic Co., Ltd. v. Loudoun Times Mirror*, 624 F.2d 518, 522 (4 Cir.1980), cert. denied, 449 U.S. 1102, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981).

ment in a pre-existing controversy, we perceive no constitutional interest in free speech which outweighs the right of regulated business enterprises to recover for false statements of fact. In this respect, regulated businesses should be treated no differently from other members of the community.[13] To summarize, there is no adequate basis for concluding that plaintiff was either a general or limited purpose public figure.

■ Having concluded that Blue Ridge Bank was not a public figure under the circumstances of this case, we think it unnecessary for us to decide whether Blue Ridge Bank succeeded in proving actual malice by clear and convincing evidence. We must, however, determine whether Blue Ridge Bank, because it was a private figure, established by a preponderance of the evidence that Veribanc was negligent in making the false statements. *Gazette v. Harris, supra.* Plaintiff argues that the jury's determination of liability under the clear and convincing/actual malice standard subsumes a determination that Veribanc was liable under a preponderance/negligence standard. We agree. *See Richmond Newspapers v. Lipscomb,* 234 Va. 277, 287–88; 362 S.E.2d 32, 37–38 (1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1997, 100 L.Ed.2d 228 (1988); *Great Coastal Express, Inc. v. Ellington,* 230 Va. 142, 152, 334 S.E.2d 846, 853 (1985). We also have no doubt that evidence regarding additional data on the magnetic tapes indicating the existence of a financial institution prior to the fourth quarter and the absence of any inquiry or investigation by Veribanc prior to publication was legally sufficient to establish Veribanc's negligence in making the false statements. Thus, we conclude that the determination of liability on the part of Veribanc should not be disturbed.

## IV.

The remaining issues raised on appeal by Veribanc require little discussion.

■ Veribanc charges that the district court's refusal to instruct the jury on law of republication in Virginia was reversible error. Blue Ridge Bank argues that this issue was not adequately preserved for appellate review, and that, in any event, the district court did not err under the circumstances of this case. We believe that the question was adequately preserved and therefore will address its merits.

In *Weaver v. Beneficial Finance Co., Inc.,* 199 Va. 196, 199, 98 S.E.2d 687, 690 (1957), the Virginia Supreme Court succinctly stated the law in this area:

> It is well settled that the author or originator of a defamation is liable for republication or repetition thereof by third persons, provided it is the natural and probable consequence of his act, or he has presumptively or actually authorized or directed its republication ... However, the original author is not responsible if the republication is not the natural and probable consequence of his Act, but is the independent and unauthorized act of a third party.

Veribanc argues that the *RTD* article was not a republication of its List Series Report, nor the natural and probable consequence of its publication. Although the *RTD* article does not contain the balance and qualifying explanation Veribanc sought to impart to its report, and, in fact, is a substantial revision of the article circulated by Dorfman, we do not think that the *RTD* article fundamentally distorts the information regarding Blue Ridge Bank contained in the List Series Report. The table containing five banks in the *RTD* article accurately reproduces the figures published by Veribanc, and, although the column headings in the *RTD* table are somewhat different from those used by Veribanc, the explanatory footnotes included in the table make the headings at least as informative as those in the List Series Report. Thus, the *RTD* article cannot be said to be the

---

**13.** Our decision today obviously does not mean that a regulated business can never be a public figure or even that such indicia of public importance should not be considered under the cir-

cumstances of each case. We simply conclude that this badge of prominence alone is insufficient to establish the enterprise as a public figure for defamation purposes.

unnatural or improbable consequence of Veribanc's publication in the sense that it imparts a fundamentally different message.[14]

Equally important, Veribanc cannot convincingly argue that publication of the *RTD* article was an improbable or unnatural result of its decision to furnish the List Series Report to Dorfman. Although Veribanc cannot be said to have authorized the *RTD* article itself, it is beyond dispute that it authorized the use of the factual statements contained in its report by Dorfman and those newspapers carrying his column.

▰▰▰ Veribanc also challenges the district court's decision to allow expert testimony concerning the future lost profits of Blue Ridge Bank. Veribanc argues that the expert testimony should have been disallowed because Blue Ridge's conversion from a savings and loan association to a bank is equivalent to the start of a new business, and because the testimony presented was inherently too speculative.

Under Virginia law, there can be no recovery of lost profits for a new business or enterprise. *See Coastland Corp. v. Third National Mortgage Co.,* 611 F.2d 969, 977–78 (4 Cir.1979) (discussing the Virginia rule and case law). However, even if we assume, without deciding, that the financial products and services offered by a full-service bank are sufficiently different from those offered by a savings and loan association to support viewing a conversion of the latter to the former as the establishment of a new business, Veribanc's argument ignores the fact that the conversion took place, and Blue Ridge Bank operated as a bank, approximately six months prior to publication of the List Series Report and the *RTD* article. Thus, unlike the factual situations in which the Virginia rule is routinely applied, there exists in this case an operating business at the time of injury. We do not think that the Virginia rule prohibits the recovery of damages or supports the exclusion of the testimony under these circumstances.

The second part of Veribanc's challenge with respect to damages is that the expert's testimony was predicated upon a variety of unsubstantiated and arbitrary assumptions regarding the actual and continuing effect of the libel on Blue Ridge Bank's deposit and account base. We acknowledge some reservations about the testimony to the extent that it was based entirely on a comparison of Blue Ridge Bank's performance compared with newly created banks in the region and did not consider either the impact of its previous operation as a savings and loan association or the six months of actual operation prior to publication of the List Series Report.

However, we are not the trier of fact and we are persuaded that Veribanc had every opportunity to attack the premises and possible shortcomings of Blue Ridge Bank's expert's analysis at trial. Veribanc took advantage of this opportunity, but was unable to establish that the methodology employed by the expert was inappropriate or that the effects of the libel would likely be felt over a shorter time frame than he contemplated. Therefore, we find no basis to conclude that the testimony was too speculative to have been considered by the jury or that the award was not supported by the testimony received.

Finally, Veribanc argues that the district court judge impermissibly interjected himself into the proceedings. Upon review of the record, we find no merit in this contention.

AFFIRMED.

▰▰▰▰

---

**14.** We do not believe the "spicier" *RTD* headline, "Possible bank flops listed," irretrievably altered the basic message of Veribanc's report.