48 F.3d 1216
 23 Media L. Rep. 1748
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
MYLAN PHARMACEUTICALS, INCORPORATED, a West Virginia
Corporation, Plaintiff-Appellee,
v.
AMERICAN CYANAMID COMPANY, a Maine Corporation, Defendant &
Third Party, Plaintiff-Appellant,
v.
Stephen McKNIGHT, Personal Representative of the Estate of
Roy McKnight, Third Party Defendant-Appellee.
Mylan Pharmaceuticals, Incorporated, a West Virginia
Corporation, Plaintiff-Appellant,
v.
American Cyanamid Company, a Maine Corporation, Defendant &
Third Party Plaintiff-Appellee,
v.
Stephen McKnight, Personal Representative of the Estate of
Roy McKnight, Third Party Defendant.
 Nos. 94-1502, 94-1472.
 United States Court of Appeals, Fourth Circuit.
 Argued: Oct. 31, 1994.
Decided: March 3, 1995.
 
 ARGUED: Rodney Orrin Thorson, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Washington, D.C., for Appellant. Andrew G.
 Fusco, FUSCO & NEWBRAUGH, Morgantown, West Virginia, for Appellees. ON BRIEF: Mark E. Herlihy, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Washington, D.C.; James F. Companion, SCHRADER, RECHT, BYRD, COMPANION & GURLEY, Wheeling, West Virginia, for Appellant. Thomas H. Newbraugh, Jeffrey A. Ray, FUSCO & NEWBRAUGH, Morgantown, West Virginia, for Appellees.
 OPINION
 Before WILKINS and MICHAEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 This case arises out of a dispute between Mylan Pharmaceuticals, Inc. (Mylan) and American Cyanamid Co. (Cyanamid) over the marketing of MaxzideRM, a drug for the treatment of hypertension. Mylan sued Cyanamid on five counts, including breach of contract and breach of the implied covenant of good faith. Cyanamid brought four counterclaims, including a claim for defamation. Neither party recovered on any of its claims. The district court granted judgment as a matter of law on several claims, and the jury denied relief on the remainder. Cyanamid now appeals, and Mylan cross appeals. We affirm on all but one issue. With respect to Cyanamid's defamation counterclaim, the district court erred in determining that Cyanamid was a limited purpose public figure. We therefore affirm in part, vacate in part, and remand for additional proceedings.
 
 I.
 
 2
 Mylan developed Maxzide in the early 1980s as a more effective alternative to existing hypertension drugs. Maxzide was produced by a process called "parallel granulation," over which Mylan eventually received a patent. Because Mylan lacked the resources and experience to market Maxzide on a massive scale, it entered into an exclusive marketing agreement with Lederle Laboratories, a division of American Cyanamid.
 
 
 3
 Under the agreement Lederle agreed to purchase annually at least a specified minimum quantity of Maxzide at a specified price and to use its "best efforts consistent with its overall business objectives and commensurate with products of like nature and market potential, to advertise, promote, and market" Maxzide. The agreement was to last seventeen years, the length of Mylan's patent protection on the parallel granulation process. Lederle launched the product later that year, and it met with initial success.
 
 
 4
 This success, however, was short-lived. In 1987, several low priced generic substitutes entered the market. These products were as effective as Maxzide, but were produced by methods other than parallel granulation to avoid infringing Mylan's patent. Mylan brought lawsuits against the first few manufacturers but eventually settled. The presence of these generics in the market place reduced Maxzide's sales volume.
 
 
 5
 In 1988, Mylan introduced a lower strength version of Maxzide ("Maxzide-25"). Mylan and Lederle modified their earlier contract by means of a letter signed by Robert Saydah (vice president and general manager of Lederle) and Milan Puskar (president of Mylan). The letter, referred to by the parties as the "Saydah Agreement", revised the original contract's pricing scheme and provided for Lederle's marketing of Maxzide-25.
 
 
 6
 In response to the onset of generic competition, Lederle decreased the resources that it devoted to marketing Maxzide. Mylan became dissatisfied with Lederle's performance and sued, claiming that Cyanamid had breached the best efforts clause of their contract. At about the same time Mylan's president and vice president stated publicly that Cyanamid was not living up to its part of the bargain.
 
 
 7
 Mylan's amended complaint made five claims against Cyanamid. First, it claimed that Cyanamid was improperly calculating its "net sales" for Maxzide, reducing the payments made to Mylan under the Saydah Agreement (Count I). Second, it claimed that Cyanamid had breached the "best efforts" provision of the agreement with respect to both Maxzide and Maxzide-25 (Counts II and III). Third, it claimed that Cyanamid had breached the implied covenant of good faith and fair dealing (Count IV). Finally, it claimed that Cyanamid failed to purchase the minimum quantity of Maxzide-25 required under the Saydah Agreement (Count V).
 
 
 8
 Cyanamid, in response, brought four counterclaims. First, it claimed that Mylan had fraudulently induced it to enter the agreement by misrepresenting the ability of its patent to stop generic competition (First Counterclaim). Second, it alleged that Mylan breached its contractual duty to protect Maxzide from generic competition (Second Counterclaim). Third, it claimed that Mylan and its chairman had defamed it (Third Counterclaim). Finally, it claimed that Mylan breached the contract by failing to obtain FDA-approved labeling (Fourth Counterclaim).
 
 
 9
 The district court disposed of several of these claims before trial, granting summary judgment for Cyanamid on Mylan's Counts I and V and for Mylan on Cyanamid's Third Counterclaim. At the close of the evidence the court granted judgment as a matter of law for Cyanamid on Mylan's Count IV. The jury returned a verdict on the remaining claims, denying relief on all of them. Cyanamid now appeals and Mylan cross appeals.
 
 II.
 A. Defamation counterclaim
 
 10
 Cyanamid first claims that the district court erred in granting summary judgment for Mylan on Cyanamid's defamation counterclaim. Cyanamid based its counterclaim on the following statements by Patricia Sunseri (Mylan's vice president) and Steven McKnight (Mylan's president): (1) Sunseri's statement that Maxzide "languished while Lederle's sales force pushed other products," (2) McKnight's statement that "Lederle literally is not living up to their contract," (3) McKnight's statements that orders from Lederle were "nonexistent" and that Lederle was "digging its hole deeper and deeper," and (4) Sunseri's statement that Cyanamid responded to Mylan's lawsuit by cutting off all orders of Maxzide. The district court held that Cyanamid was a limited purpose public figure for the purposes of the above statements and that Cyanamid failed to show the requisite "actual malice" to hold Mylan liable for defamation.
 
 
 11
 The First Amendment provides less protection to a defamation plaintiff when that plaintiff is a public official or public figure rather than a private individual. In New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964), the Supreme Court held that a public official may recover for a defamatory falsehood only if he can show that the statement was made with "actual malice," that is, with knowledge that it was false or with reckless disregard for its truth or falsity. The Court later extended this standard to "public figures" as well as public officials. See Curtis Publishing Co. v. Butts, 388 U.S. 130, 162-65 (1967).
 
 
 12
 In Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974), the Court held that a person could be considered a public figure for a limited range of issues by voluntarily injecting himself into a particular public controversy. Such a "limited purpose public figure" must show actual malice to recover for a defamatory statement relating to that controversy.
 
 
 13
 Here, the district court determined that Cyanamid became a limited purpose public figure by virtue of its launch and promotion of Maxzide, which were of "virtually unprecedented intensity." By voluntarily putting itself into the public eye, the court concluded, Cyanamid became a limited purpose public figure with regard to the controversy about its marketing of Maxzide.
 
 
 14
 We recently set out a two-part test for determining whether a defamation plaintiff is a limited purpose public figure. See Foretich v. Capital Cities/ABC, Inc., 37 F.3d 1541 (4th Cir.1994). First, a "public controversy" must exist giving rise to the alleged defamation. Second, the nature and extent of the plaintiff's participation in that controversy must be sufficient to justify "public figure" status. Id. at 1553. We find that no public controversy exists here and that the district court erred in determining that Cyanamid is a limited purpose public figure.
 
 
 15
 In Foretich we adopted the District of Columbia Circuit's definition of "public controversy" as "a real dispute, the outcome of which affects the general public or some segment or it in an appreciable way." Id. at 1554 (quoting Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1296 (D.C.Cir.), cert. denied, 449 U.S. 898 (1980)). We noted that "[e]ssentially private concerns or disagreements do not become public controversies simply because they attract attention." Id.
 
 
 16
 We considered the same issue in two cases prior to Foretich. In National Found. for Cancer Research (NFCR) v. Council of Better Business Bureaus, 705 F.2d 98 (4th Cir.), cert. denied, 464 U.S. 830 (1983), the Council for Better Business Bureaus published a statement regarding the percentage of the NFCR's total income that was spent on program services. We decided that the NFCR was a limited purpose public figure for the purpose of this statement by virtue of its massive solicitation efforts, through which it "extolled its judicious use of donated funds in finding a cure for cancer." Id. at 101. In Blue Ridge Bank v. Veribanc, Inc., 866 F.2d 681 (4th Cir.1989), we held that a bank was not a limited purpose public figure for the purpose of a statement regarding its "corporate financial health." While the bank had engaged in an extensive promotional campaign, it had never raised its financial health as part of its promotional message. Id. at 687.
 
 
 17
 No public controversy exists in the present case. The conflict between Mylan and Cyanamid is a purely private contractual dispute about whether Cyanamid used its best efforts to market Maxzide. The allegedly defamatory statements dealt only with the adequacy of Cyanamid's marketing efforts; they did not deal with any issues that could potentially affect the public, such as Maxzide's effectiveness or whether Maxzide would continue to be distributed. The general public will not be affected by the outcome of this dispute.
 
 
 18
 This case is distinguishable from NFCR. In that case, NFCR's claim of judicious use of donated funds was part of the message of its solicitation campaign. Here, as in Blue Ridge Bank, the subject of dispute (the adequacy of Cyanamid's marketing efforts) was not a part of Cyanamid's promotional message. Therefore, we conclude that the district court erred in finding that Cyanamid was a limited purpose public figure, and it thus erred in requiring Cyanamid to establish actual malice to maintain its claim of defamation. We vacate this finding and reinstate this counterclaim for additional proceedings under the standard applicable to a private individual.
 
 B. Evidentiary rulings
 
 19
 Cyanamid claims that the district court erroneously admitted several pieces of evidence that prejudiced Cyanamid at trial. First, the court admitted letters from Milan Puskar (Mylan's president) to Cyanamid, in which Puskar expressed his opinion that Cyanamid was failing to meet its contractual obligations. Second, the court admitted a Lederle internal memorandum regarding complaints by Mylan prior to the lawsuit and deposition testimony by the memorandum's author explaining the memorandum. Third, the court admitted testimony from Puskar about his frustration with the deteriorating relationship between the parties. Finally, the court admitted a copy of Cyanamid's 1991 Marketing Plan from which Mylan alleged Cyanamid had intentionally omitted pages. Much of this evidence was initially admitted to support the claim of bad faith, which was later disposed of as a matter of law.
 
 
 20
 We are satisfied that any error with respect to each of these items of evidence would be harmless. Any prejudice caused by each item would have been primarily with respect to the claims for breach of the best efforts provision--claims that were decided in Cyanamid's favor. At any rate, the prejudice would have been minimal in the context of a trial lasting well over a month and involving hundreds of pieces of documentary evidence. With regard to the letters in particular, the judge took steps to minimize their prejudice, including removing portions relevant only to the claim of bad faith and giving a limiting instruction that the letters should not themselves be regarded as proof of a claim. Therefore, Cyanamid suffered no substantial prejudice, and these rulings do not constitute reversible error. Fed.R.Evid. 103(a).
 
 C. Effect of admission
 
 21
 Cyanamid's final assertion of error is that the district court's jury instructions failed to give proper effect to admissions in Mylan's pleadings. In its reply to Cyanamid's counterclaims, Mylan admitted that it owed the following duties to Cyanamid: (1) to defend its Maxzide patents against challenges, (2) to defend the protection from competition afforded by its patents, and (3) to defend its FDA approval for Maxzide and the protection afforded by that approval. The court ultimately instructed the jury only that "Cyanamid claim[ed] that Mylan made" these promises. It continued that if the jury found that Mylan failed to perform one of the "alleged" promises, then its verdict "may" be for Cyanamid. If it did not find that Mylan had violated a promise, then its verdict "may" be for Mylan. Cyanamid alleges that this instruction failed to give the proper conclusive effect to Mylan's admissions.
 
 
 22
 When reviewing a jury instruction we must examine the instructions as a whole and in the context of the entire case. Hunnicutt v. Wright, 986 F.2d 119, 122 (5th Cir.1993); see also Hogg's Oyster Co. v. United States, 676 F.2d 1015, 1019 (4th Cir.1982) (must view instructions as a whole). Viewing the instructions in context, we are satisfied that Cyanamid was not substantially prejudiced. While the district court described the above duties as "alleged," Mylan officials and other witnesses freely admitted at trial that Mylan owed Cyanamid these duties. No serious factual dispute existed in this regard. The court properly instructed the jury to rule in favor of Cyanamid if it found a breach or in favor of Mylan if no breach occurred. Therefore, we find that any error in the court's instructions was harmless.
 
 D. Implied covenant of good faith
 
 23
 Mylan claims that the district court erred in granting judgment as a matter of law on its claim for breach of the implied covenant of good faith and fair dealing. At trial Mylan based its claim on two alleged misrepresentations by Cyanamid. First, Mylan claims that Cyanamid enticed it to enter into an exclusive marketing agreement by misrepresenting its plan to market Maxzide-25 at a 1988 slide presentation. Second, Mylan contends that Cyanamid intentionally omitted fifteen pages from the 1991 Maxzide marketing plan that it gave Mylan. These pages, Mylan maintains, would have shown Cyanamid's intent to deemphasize Maxzide in favor of other drugs.
 
 
 24
 At the close of Mylan's case in chief, Cyanamid moved for judgment as a matter of law on this claim, asserting that the claim lacked a legally sufficient evidentiary basis and that an implied covenant of good faith would be coextensive with the contract's express best efforts provision. The district court denied the motion on the former grounds, finding that sufficient evidence existed for a reasonable jury to find bad faith. At this point the court did not consider whether the bad faith claim merely duplicated the claim for breach of the best efforts provision. At the close of evidence Cyanamid renewed its motion for judgment on the pleadings. This time the court granted the motion from the bench on the grounds (i) that the bad faith claim was duplicative of the claim for breach of the best efforts provision and (ii) that to the extent it was not duplicative, it lacked a sufficient evidentiary basis.
 
 
 25
 Judgment as a matter of law is appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the non-moving party. Fed.R.Civ.P. 50(a). It should be granted when, viewing the evidence most favorably to the party opposing the motion, a reasonable trier of fact can draw only one conclusion. Ingram Coal Co. v. Mower Ltd. Partnership, 892 F.2d 363 (4th Cir.1989).
 
 
 26
 West Virginia implies a covenant of good faith into every U.C.C. contract. W. Va.Code Sec. 46-1-203. In the case of a merchant, "good faith" means "honesty in fact and the observance of reasonable standards of fair dealing in the trade." W. Va.Code Sec. 46-2-103(1)(b). A best efforts provision subsumes an obligation to act in good faith in exercising those best efforts. Tigg Corp. v. Dow Corning Corp., 962 F.2d 1119, 1126 n. 7 (3d Cir.1992). While the U.C.C. covenant of good faith is broader than an exclusive dealer's specific duty to use best efforts, e.g. Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir.1992); Permanence Corp. v. Kennametal, Inc., 908 F.2d 98, 100 n. 2 (6th Cir.1990), to survive a motion for judgment as a matter of law Mylan must produce sufficient evidence for a jury to find bad faith beyond mere failure to use best efforts. Otherwise, the claim for breach of the implied covenant is merely duplicative of the claim for breach of an express contract provision and may not be maintained as a separate claim. See USX Corp. v. Prime Leasing, Inc., 988 F.2d 433, 438 (3d Cir.1993) ("[O]ne can invoke 'implied' terms only when there are no express terms in the contract relating to the particular issue."); Iafolla v. Douglas Pocahontas Coal Corp., 250 S.E.2d 128, 134 n. 3 (W. Va.1978) ("[A]n implied covenant will not supercede [sic] an express contradictory covenant.").
 
 
 27
 We agree that Mylan's bad faith claim is based on insufficient evidence to the extent that it alleges anything other than a breach of the best efforts provision. With regard to Mylan's "bait and switch" allegation, the slide show presentation occurred after Mylan had signed an agreement with respect to Maxzide-25. Therefore, Mylan's claim that Cyanamid "enticed" it to enter into the agreement is insupportable. Mylan's second allegation is based entirely on a marketing plan that it found on the eve of trial was missing pages. Mylan produced no evidence that the pages were missing when Cyanamid gave the plan to Mylan, that Cyanamid knew the pages were missing, or that Cyanamid intentionally omitted the pages in an attempt to conceal information from Mylan. Even drawing all reasonable inferences in Mylan's favor, this allegation is little more than speculation. No reasonable jury could find a breach of the implied covenant of good faith from the evidence that Mylan produced. Accordingly, the district court properly granted judgment as a matter of law in favor of Cyanamid.
 
 E. Tigg instruction
 
 28
 Mylan claims that the district court erred in denying its proposed jury instruction with regard to its breach of contract claim. The proposed instruction was based on the Third Circuit's holding in Tigg Corp. v. Dow Corning Corp., 962 F.2d 1119, 1125 (3d Cir.1992), that a best efforts clause "forces the buyer/reseller to consider the best interests of the seller and itself as if they were one firm." Mylan requested the court to instruct the jury that the best efforts clause required Cyanamid to act in Mylan's best interests rather than its own. Tigg, however, involved an implied best efforts provision. The agreement between Mylan and Cyanamid contains an express best efforts provision which explicitly limits Cyanamid's duty to efforts "consistent with its overall business objectives." In other words, the agreement allows Cyanamid to act in accordance with its own objectives if they conflict with those of Mylan. Therefore, the district court properly denied Mylan's proposed instruction.
 
 F. Mylan's Count I
 
 29
 Mylan next contends that the district court erred in granting summary judgment on its Count I, which alleged that Cyanamid undercompensated Mylan for its purchases of Maxzide. The Maxzide agreement required Cyanamid to pay Mylan a certain amount for each package of Maxzide that Cyanamid sold. The Saydah Agreement provided a formula for this amount based on Cyanamid's "net sales" or "average selling price." Average selling price was computed by dividing Cyanamid's total revenue by the number of units actually sold. The parties disagree as to whether, when Cyanamid offered a "buy ten, get two free" discount, the two "free" units should have been counted as units "actually sold."
 
 
 30
 In its motion for summary judgment on this count, Cyanamid attached an affidavit from an expert witness that under normal trade usage the two "free" units would be considered actually sold. Mylan produced no evidence of trade usage, but rather relied on deposition testimony from Mylan and Cyanamid officials regarding their intent. Milan Puskar (Mylan's president) and Rod Jackson (Mylan's vice president) both testified that at the time the Saydah amendment was signed they believed that "free" units should not be considered actually sold. Robert Saydah (Lederle's president at the time the Saydah agreement was signed) also testified about the meaning of "net sales." While his testimony is inconsistent, part of his testimony and a sample calculation that he performed indicate he agreed with Mylan that the "free" goods should not be counted as actually sold.
 
 The West Virginia U.C.C. provides that
 
 31
 Terms ... set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
 
 
 32
 (a) by course of dealing or usage of trade ... or by course of performance.... W. Va.Code Sec. 46-2-202. Under this provision, evidence of trade usage may explain or supplement even a contract that is clear on its face. See W. Va.Code Sec. 46-1-205 cmt. 1 ("The measure and background for interpretation are set by the commercial context, which may explain and supplement even the language of a formal or final writing."); W. Va.Code Sec. 46-2-202 cmt. 1(c) ("This section definitely rejects ... [t]he requirement that a condition precedent to the admissibility of [trade usage, course of dealing, or course of performance] is an original determination by the court that the language used is ambiguous."). However, the Code and Commentary leave unclear the extent to which other types of extrinsic evidence of intent may be admissible where a contract term is ambiguous.
 
 
 33
 The district court, citing Sec. 46-2-202, granted summary judgment in favor of Cyanamid because of Mylan's failure to introduce evidence of trade usage. It did not consider Mylan's evidence of the parties' subjective intent. While the district court did not make clear the basis for its decision, it apparently concluded that under Sec. 46-2-202 only evidence of trade usage, course of dealing, or course of performance is admissible to explain a contract's meaning. Thus, this issue turns on the extent to which Mylan may introduce extrinsic evidence of the parties' subjective intent to show the meaning of a contract under the U.C.C.
 
 
 34
 The U.C.C. modified the common law parol evidence rule by giving special weight to evidence of trade usage and commercial practices. In effect, trade usage becomes part of the contract:
 
 
 35
 [Contracts] are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used.
 
 
 36
 W. Va.Code Sec. 46-2-202 cmt. 2. See also W. Va.Code Sec. 46-1-205(3) ("[A]ny usage of trade in the vocation or trade in which [the parties] are engaged or of which they are or should be aware give[s] particular meaning to ... terms of an agreement.") Other types of extrinsic evidence may be admissible to explain an ambiguous contractual term. However, because trade usage is deemed incorporated into the con tract unless specifically negated, it must be considered when determining whether a term is ambiguous. Parol or extrinsic evidence like that offered by Mylan is inadmissible to explain a term which is unambiguous when read in light of trade usage.
 
 
 37
 Furthermore, Mylan's proffered evidence shows at most the parties' unexpressed, subjective interpretations of a contract term. Both the U.C.C. and West Virginia common law express a preference for objective, rather than subjective, manifestations of intent. See W. Va.Code Sec. 46-1-205 cmt. 1 ("[T]he meaning of the agreement of the parties is to be determined by the language used by them and their action, read and interpreted in the light of commercial practices and other surrounding circumstances" (emphasis added)); Watson v. Buckhannon River Co., 45 W. Va. 164, 175 (1923) ("[W]hen there is doubt as to [a contract's] proper meaning, the construction which the parties have put upon it by their acts is entitled to great consideration." (emphasis added)); Restatement (Second) of Contracts Sec. 212 cmt. a (1981) ("[T]he relevant intention of a party is that manifested by him rather than any different undisclosed intention.").
 
 
 38
 Because the term "net sales" was unambiguous in light of Cyanamid's uncontested evidence of trade usage, the district court properly disregarded Mylan's proffered evidence of subjective intent. We therefore affirm the district court's grant of summary judgment on this claim.
 
 G. Mylan's Count V
 
 39
 Count V alleged that the Saydah Agreement created a separate requirement that Cyanamid purchase a minimum quantity of Maxzide-25 in addition to Cyanamid's existing obligation to purchase a minimum quantity of Maxzide. Mylan argues that the series of correspondence leading up to the letter signed by both parties should be considered part of the Saydah Agreement. It claims that that correspondence taken as a whole shows that the parties intended to create a separate minimum quantity requirement for Maxzide-25. The district court held that the prior correspondence was at most a series of offers and counteroffers, was not part of the contract, and was therefore inadmissible parol evidence. It concluded that the Saydah Agreement did not create a separate minimum purchase requirement for Maxzide-25. Finding no error, we affirm the judgment on this count on the reasoning of the district court. Mylan Pharmaceuticals, Inc. v. American Cyanamid Co., Civ. No. 90-0121-C(S) (N.D.W. Va. July 27, 1993).
 
 H. Failure to recuse
 
 40
 Mylan argues that the judge below erred in failing to recuse himself. While the summary judgment motions were pending, one of the judge's law clerks contacted Cyanamid's local counsel regarding potential employment. After the motions had been decided, the clerk interviewed with the firm and eventually received, but did not accept, an employment offer. The clerk continued to work on the case until Mylan's motion for recusal on the eve of trial. The judge then removed him from the case.
 
 
 41
 We find the district judge's action was entirely proper. A judge need recuse himself only when his impartiality might reasonably be questioned. 28 U.S.C. Sec. 455(a); People Helpers Found., Inc. v. City of Richmond, Va., 12 F.3d 1321, 1325 (4th Cir.1993). The mere fact that a judge's clerk interviews with counsel for a party regarding potential future employment does not by itself create a reasonable question as to the judge's impartiality. While a law clerk must be removed from a case if he accepts an employment offer from a party's counsel, see, e.g., Hunt v. American Bank & Trust Co., 783 F.2d 1011, 1016 (11th Cir.1986), in this case the judge's clerk did not accept an offer. See Alvin B. Rubin & Laura B. Bartell, Law Clerk Handbook 23 (1989) (stating only that "[w]hen a clerk has accepted a position with an attorney or with a firm, that clerk should cease further involvement in those cases in which the future employer has an interest," and implying that a judge may choose to place "no restrictions ... on a law clerk's applications for employment") (emphasis added). Furthermore, the judge removed the clerk from this case as soon as he was aware that the clerk had received an employment offer from Cyanamid's local counsel. This was sufficient to avoid an appearance of impropriety. See Hunt, 783 F.2d at 1016; Reddy v. Jones, 419 F.Supp. 1391 (W.D.N.C.1976). Therefore, the judge did not err in failing to recuse himself.
 
 
 42
 I. Denial of summary judgment on Cyanamid's counterclaim for fraudulent inducement
 
 
 43
 Mylan next maintains that the district court erred in denying its motion for summary judgment on Cyanamid's fraudulent inducement counterclaim. Despite the fact that the jury awarded no damages on this counterclaim, Mylan claims that it was prejudiced on its other claims by evidence that was admitted solely to establish fraudulent inducement. If summary judgment had been granted before trial, Mylan maintains, this evidence would have been excluded. Thus, Mylan is in the unusual posture of appealing a count on which it prevailed at trial.
 
 
 44
 Nearly every circuit to consider the issue has held that the denial of a motion for summary judgment may not be appealed following a final verdict on the merits. See, e.g., Watson v. Amedco Steel, Inc., 29 F.3d 274 (7th Cir.1994); Black v. J.I. Case Co., 22 F.3d 568, 570-71 (5th Cir.), cert. denied, 115 S.Ct. 579 (1994); Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co., 19 F.3d 431, 434 (8th Cir.1994); Lama v. Borras, 16 F.3d 473, 476 n. 5 (1st Cir.1994); Locricchio v. Legal Servs. Corp., 833 F.2d 1352, 1358 (9th Cir.1987). Because denial of summary judgment is interlocutory, O'Connor v. United States, 956 F.2d 48, 52 (4th Cir.1992), the only appealable final judgment is the judgment on the verdict. Johnson Int'l, 19 F.3d at 434.
 
 
 45
 Thus, Mylan seeks to appeal a verdict in its favor. A party generally may not appeal an issue on which it prevailed on the merits. Deposit Guaranty National Bank v. Roper, 445 U.S. 326, 333 (1980). While an exception exists permitting a party to appeal "an adverse ruling collateral to judgment on the merits" if that party retains a stake in the controversy, id. at 333-34, a summary judgment motion is not collateral to the merits of a claim. Therefore Mylan's appeal does not fall within this exception, and we may not review the district court's denial of summary judgment.
 
 J. Other errors
 
 46
 Mylan asserts that the district court committed four additional errors warranting reversal. First, it claims that the court improperly excluded evidence that Mylan "blew the whistle" on fraudulent prac tices by other manufacturers of generics. Second, it claims that the court erred in allowing Cyanamid's expert to testify as to analyses that he performed after he was deposed. Third, it maintains that the order of closing arguments was improper. Finally, it asserts that the court erred in excluding testimony about Puskar's charitable contributions. We find that none of these actions was error and affirm on the reasoning of the district court. Mylan Pharmaceuticals, Inc. v. American Cyanamid Co., Civ. No. 90-0121-C(S) (N.D.W. Va. Feb. 28, 1994).
 
 
 47
 K. Jury verdict on Mylan's Counts II and III
 
 
 48
 Finally, Mylan claims that the verdicts on its two counts for breach of the best efforts provision were against the weight of the evidence. Judging the weight of the evidence is "a matter resting within [the district court's] sound discretion and is not reviewable save in the most exceptional circumstances." Poynter v. Ratcliff, 874 F.2d 219, 223 (4th Cir.1989). Here, plenty of evidence indicated that Cyanamid did not breach the best efforts provision, including evidence that (1) Cyanamid strongly promoted Maxzide, (2) Maxzide's market loss was no greater than that of other brand-name drugs faced with generic competition, and (3) independent reasons existed for Maxzide's decline, including weak patent protection, changes in medical thinking, and FDA actions. The district court did not abuse its discretion in refusing to grant a new trial.
 
 III.
 
 49
 For the foregoing reasons, the judgment of the district court is affirmed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion on Cyanamid's counterclaim for defamation.
 
 
 50
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED